State vs. Roberts alias Ward.

THE STATE OF MISSOURI vs. ROBERTS alias WARD.

1. Roberts alias Ward was arrested as a vagrant under a city ordinance of St. Louis, and confined in the Calaboose. He promised the city authorities, that if they would, liberate him, he would leave the city within a stipulated time. This he failed to do, and the city Marshall ordered his arrest. In attempting to arrest him, without a warrant, Hibler, a police man was killed. Held that the breach of promise to leave the city, was no legal ground for his arrest, that it was important to show that Hibler was a watchman, that Roberts was guilty of a violation of the city ordinances, or that he was a vagrant within the purview of the same, and if these facts are shown to have existed, the police might legally arrest him without a warrant.

2. But it was not necessary to aver in the indictment, that Hibler was a police officer, or that Roberts was a vagrant. This is not similar to an indictment against a person, for resisting an officer in the discharge of his duty. It is the character of the person resisting, that partly infuses itself into the act of resistance, and deepens its criminality, which is otherwise, where a person resists an officer, in the performance of his duty.

3. When two persons are jointly indicted, neither is admissible as a witness for his co-defendant, and this rule equally prevails, whether they are tried jointly or separately. The witness is incompetent, not on the ground of interest, but public policy. Where there is no evidence to criminate a defendant, or where he is by mistake made such, or where he is made a defendant for the purpose of excluding his testimony, the practice is for the court to direct his acquittal, that he may be used as a witness.

State vs, Roberts alias Ward.

## APPEAL from St. Louis Criminal Court.

BROWN, for respondent.

I. The court below erred in admitting the dying declarations of Ephraim Hibler, because, as shown by the evidence, the same were not his own voluntary statements, but were drawn from deceased by one who went to collect testimony against the defendant. Hence the influences operating upon the mind of the witness, whose dying declarations are sought to be introduced, were not such as would dispense with the necessity of an oath.

II. That the court below erred in admitting evidence going to show that before the time of the arrest the defendant was a vagrant. Such evidence could not be introduced under the indictment in the case, because it gave the defendant no notice of such an issue and did not enable him to prepare his defence in that respect. If it was necessary to establish this fact, in order to make out the crime, then was the fact a material one and should have been alleged. See Roscoe Crim. Ev. page 81, directly in point; also Wharton's American Cr. L. p. 81, 82; also page 78.

That the evidence could not be introduced as showing malice, because it did not connect, in any wise, with the intention of the defendant at the time of the arrest and the killing. Possibly, "implied malice" might have been shown under a proper indictment, by evidence of the fact that at the time of the arrest the defendant was committing an act of vagrancy—but this does not justify the introduction of evidence to prove an altogether different offence, that thereby an implication may arise that the defendant was a vagrant at the time. See especially "Wharton's Am. Cr. Law page 78, and authorities there cited. Vagrancy, as well as any thing else under the sun, may cease, and hence proof that defendant was formerly a vagrant is totally disconnected with the issue and should have been ruled out by the court below.

III. That the court below erred in refusing to admit the testimony of Richard Jones, who had been jointly indicted with the defendant, but to whom a separate trial had been granted. In support of this position the defendant contends that when there is a severance of the trial the indictment becomes several as to each and to all interests, as much so as if they had been separately indicted, and if separately indicted there could be no doubt about the competency of the evidence. See 6 Mo. p. 4, Garnett vs. State; Greene Ev. p. ——, Rex vs. Ellis; 1 McNally 55; Russl. Cr. L. 597; Jones vs. State of Georgia, 1 Kelly 617 ; Roscoe Cr. Ev; Comments upon Lafone's case, 5 Esp. 154. That at best the question is but a rule of evidence, and should be governed, as much by *propriety* and *wise policy* as by *precedent*. That as the objection to the testimony originates in its doubtful character, and objection should go its credibility alone, and not to its competency. This would be more in accordance with the spirit of the New Code and the present age than the exclusion contended for by the State. Moreover, that it was the intention of the Statute Law, granting co-defendent the right to sever to make the severance complete, as much so as if separately indicted: Rev. Code Chap. 138 Art. 6, Sects, 22 and 3.

IV. That the court below erred in granting the 1st and 3d instructions, asked by the State, and in refusing the 16th and 17th instructions asked by the defendant. These instructions, together with the opinion of the supreme court in this case on a former trial involve the question of the right of arrest without a warrant. In the opinion of the supreme court the hypothesis is assumed, that if the defendant was arrested as a night walker, the arrest was lawful, although done without a warrant. The defendant contends, that to justify an arrest without a warrant, night-walkers can only be so arrested when found in the commission of some unlawful act, or when there is reasonable ground to suspect a felony. See Chitty Cr. Law Vol. 1 page 23, and note K, note A; B. Ab. Trespass D. 3 § 2; See Raymond R. 1301.

In the instructions granted, the court erred in assuming the ground that if the arrest was made in conformity with the city ordinance concerning vagrants, then it was lawful, although done

State vs. Roberts alias Ward.

without a warrant, because, as the defendant affirms, the ordinance itself is not in accordance with the chartered powers of the city and repugnant to the statute laws concerning vagrants, passed February 28th, 1845. See R. S. 563, in this:

1. It imposes penalties greater than those permitted by the city charter. See city charter, act February 8th, 1843, art. 3rd, sec. 45.

2. It is repugnant to the statute in imposing a penalty different from that affixed by statute. See R. S. 563, as compared with ordinance concerning vagrants, Rev. Ord. 407.

3. It is repugnant to the statute and common laws, in declaring that to be legal and competent evidence of crime, which the statute and common law do not recognize as such.

4. It is repugnant to the statute law in defining vagrancy differently from the statute, and in making that vagrancy by ordinance, which is not vagrancy by statute.

5. It is unconstitutional in requiring excessive bail.

The instructions of the court were further erroneous in assuming that it was lawful, even under the city ordinance to arrest without a warrant. Yet, this assumption is contained in the instructions given. See Walker's Am. cr. law 599.

V. That the court below erred in refusing the other instructions asked by the defendant.

VI. That the court below erred in refusing to sustain the motion made by defendant for a new trial.

The motion was, in all respects formal. Vide Wharton's cr. law, p. 657; 5 Sarg. and Rawl. 41.

That even if not formal the motion was based upon a surprise in evidence which cured any apparent irregularities or deficiencies in reference to allegations of newly discovered evidence. Vide Wharton's C. L. 657; 5 Cow. 106; Burge vs. Calloway, 7 Price 677; Miller vs. Field, 3 A. K. Mash. 104.

VII. The court below erred in overruling the motion made by defendant to arrest the judgment in the case.

## Lackland, for the State.

I. The court did not err in admitting the dying declarations of the deceased. The foundation for their introduction was sufficiently laid. Deceased said to witness, Felps, that he had no hopes of recovery; had made a will, and said he must die, and bid Felps, farewell.

It clearly appears, that deceased did not expect to survive the injury—that he had lost all hopes of recovery; and this is all the law requires:. Wharton's Cr. L. 179, 180; Rex vs. Bonner, C. C. and P. 386; Dunn vs. State, 2 Pike 246; 1 East P. C. 385; Rex vs. Dingler, 2 Leach 561; Anthony vs. State, Meig's 265.

When the declarations are in articulo mortis, is a question to be decided by the court (and not by the jury) from all the circumstances connected therewith. It does not necessarily require a declaration in words from the deceased, that he has lost all hope of recovery: State vs. Anthony Meigs, 279, 280.

II. The court did not err in admitting proof, tending to show that defendant was a vagrant. This court in the opinion heretofore delivered in this cause, say, "It cannot be denied that the legality of defendant's arrest was a material question in determining the character of the homicide." It is also declared, in the same opinion—"We are of opinion; that the legality or ill-legality of the arrest in this case might affect the degree of guilt of the prisoner, &c." It was therefore proper to show that the arrest was legal, as the grade of the offence might depend upon the fact. And to that end it was competent to show that defendant was a vagrant, within the intent and meaning of ordinance No. 1850: Rev. city ordinance 1850. page 407—such a person, as deceased was bound to arrest. Upon this question the right to make this arrest depended. This fact, together with the fact that deceased was an acting policeman on duty, constituted his warrant or lawful authority for making the arrest, and stood in lieu of a written warrant; and was as necessary to be shown, to establish the legality of the arrest, as would a written warrant, under the hands of a proper officer, if the arrest had been made or attempted by virtue of such warrant.

State vs. Roberts alias Ward.

It was necessary (to show that the arrest was legal,) to show that the homicide was without mitigating circumstances. To this end it was competent to prove that defendant was a vagrant, that deceased was a policeman, performing his duty, and that the arrest was conducted in a proper manner.

The court properly refused to allow Richard Jones to testify as a witness in favor of defendant; because said Jones was a co-defendant and a party to the record, standing neither acquitted nor convicted. In 1 Phil. Ev., 6 Am. from 9 Lond. Ed. 67, it is laid down, that "in criminal prosecutions, one of several persons jointly indicted, may be rendered competent to give evidence, either for the prosecution or co-defendants." And this is done, by entering a nolle prosequi or by defendant's pleading in abatement, and for want of a replication, judgment of discharge is entered. It is clear, therefore, that agreeably to this test, an accomplice jointly indicted, is not competent to testify until rendered so by being discharged from the record.

A co-defendant, jointly indicted and separately tried, is not competent to testify for defendant. Nor does our statute, giving the right to a separate trial beyond the discretion of the court, affect the question: People vs. Williams, 19 Wend. 377.

Co-defendants in an indictment, cannot be witnesses for each other, unless they have been first acquitted or convicted, and this, although the trial be had in different counties: State vs. Mills, 2 Dev. 420.

When two persons are jointly indicted for a felony, and severally tried, the co-defendant in the same indictment is not a competent witness for prisoner, unless the co-defendant has been acquitted, whether separately or jointly tried: Campbell vs. Com., 2 Vir. cases 317.

Where two persons are jointly indicted for uttering a forged note, and the trial of one was postponed, it was held that he could not be called as a witness for the other: Com. vs. Barton, 10 Pick. 57.

It is an inflexible rule, that parties to the record, whether in civil actions or criminal prosecutions, are not admissible as witnesses. This is founded upon public policy. But for this rule, accomplices and co-defendants would be influenced to commit perjury to protect each other and evade the ends of justice: Com. vs. Barton, 10 Pick. 57.

No person, who is a party to the record is a competent witness, and will not be permitted to exculpate his co-defendant, even in case of trespass: Chapman vs. Graves, 2 Camp. 334.

In an indictment for a conspiracy, the wife of one of the defendants cannot be called as a witness for the other: Rex vs. Loker, 5 Esp. Rep. 107.

Whether the trial be joint or several, a defendant in an indictment cannot, until finally discharged, be a witness for another, and whenever the wife of one is not permitted to testify for the others on a joint trial, she will not be received for them, although her husband be not then on trial: State vs. Smith, 2 Iredell 405.

On a joint indictment against several for a misdemeanor, a defendant who had suffered judgment to go by default, cannot be called as a witness for the others. There is a community of guilt. The offence is the offence of all: Rex vs. Lafone, 5 Esp. Rep. 154.

It appears to be a technical rule of evidence, and one well settled, that a party in the same suit or indictment, cannot be a witness for his co-defendant, until he has been first acquitted, or, at least, convicted. Whether defendants be tried jointly or separately, does not vary the rule. It is his being a party to the record that renders him incompetent: People vs. Bill, 10 Jones 94.

This was an indictment for larceny, and in the trial, no evidence appearing against one of the prisoners, the counsel for the others moved that he be sworn as a witness in their behalf. The court overruled the motion and rejected the witness: State vs. Carr, 1 Cox, 1 N. J. Rep.

An accessary jointly indicted with a principal in felony, may be a witness for the State, but, it seems, not for the prisoner: State vs. Calvin et. al. R. M. Charlt. 151.

The judge, in delivering the opinion of the court, in the case last referred to, says, "A particeps criminis, or accomplice, may be a witness for the crown, or here, for the State, against the prisoner; but has the prisoner the correlative right of examining the accomplice as his witness? "I do not, until better advised, understand this to be the law. The current of authorities is opposed to it, and no cases have been cited, where the trials have been severed for the purpose of allowing

State vs. Roberts alias Ward.

one, charged with a felony, to give testimony in favor of others associated with him in the accusation": Ibid. 164.

One of several persons, jointly indicted for a riot, although he has pleaded and defended separately, is not a competent witness for his co-defendant. When defendants are jointly indicted for misdemeanors, they cannot be witnesses for or against each other until discharged from the prosecution or convicted: State vs. Mooney et al., 1 Yerger 431. And this case has since been cited, and the doctrine approved of by the same court, in Moffit vs. State, 2 Humph. 99.

Judge Napton, in delivering the opinion of this court in the case of McMullan vs. State, 13 Mo., 34, says: "The general current of authorities, both in England and this country, is, unquestionably, that where several persons are jointly indicted, one is not a competent witness for the other, without being first acquitted or convicted, and it makes no difference whether they plead jointly or severally " And upon an examination of the subject somewhat hastily, he found no authority to the contrary.

We are aware, in the case of Garret vs. State, 6 Mo. p. 4, this point was decided against the State, and 2 Starkie, 22, is cited as authority to sustain that decision. We suppose this reference is to Starkie on evidence, but find nothing on the page referred to, applicable to the subject. In 2 Stark. on Ev., 13, the subject is discussed, and after the principle touching the examination of accomplices, at the instance of the crown, are disposed of, it is stated: "So an accomplice is a competent witness for his associates, as well as against them, although they be severally indicted for the same offence, whether he is convicted or not, provided he be not disqualified by a judgment."

It is not contended, that the fact of the witness being an accomplice alone renders him incompetent. Nor do we hold, that if accomplices are *severally*, i. e., *separately* or *distinctly* (Webster's dictionary, word severally) indicted for an offence, they are thereby rendered incompetent witnesses, because this does not make them parties to the record. But we find it no where laid down in Starkie on evidence, that accomplices, jointly indicted and severally tried, can testify for each other; which is the proposition under consideration.

The supreme court of Georgia have also decided this point against the State. The court, in the case of the State vs. Jones, 1 Kelly, 617, says, in substance, the defendants elected to be tried separately, and the indictment and trial are to be considered several, as to each, as much as if they had been severally indicted. That the court was of opinion that the witness was competent, he havrng served on the trial. For the purpose of the trial, they were to be considered as separately indicted. No authority referred to.

The supreme court of Georgia then say, an accomplice, separately indicted, is competent, and cite various authorities to support it. While we agree to the soundness of the latter proposition, we confess our inability to see how it is, that a separate trial merely makes a joint indictment a separate one—that a mere severance in the trial, discharges a party from the record.

The court say, in the case of the State vs. Jones, the rule contained in the former proposition is the more readily adopted to abolish a very pernicious practice which prevails in their courts, of including all persons present at the commission of an offence, whether guilty or not, to exclude their testimony. The court adopts this as a rule, it seems, and the reason given for adopting the rule allowing accomplices jointly indicted and severally tried, to testify for each other, appears to be local in its character. It being for the purpose of correcting pernicious errors which have crept into the practice of the courts of that State. Without questioning the right of the supreme court of Georgia to adopt rules to correct or abolish pernicious practices in their inferior tribunals, or the soundness or inefficiency of the rule thus adopted, we hold the principle to be elementary, that the rule becomes inoperative and inapplicable, when the reason thereof does not exist; and we deny that any pernicious practice obtains in the courts of this State as calls for the establishing of such a rule.

This court cannot presume that a grand jury, after having taken the most solemn and impressive oath connected with jurisprudence, to present the truth, would deliberately indict in-

State vs. Roberts, alias Ward.

nocent witnesses to suppress them, and yet this rule, adopted by the supreme court of Georgia, is founded upon this unreasonable hypothesis. And the law presumes the pains and penalties of perjury a sufficient guaranty against false witnesses, swearing for such ends. These are the legal preventions of such a pernicious practice, and this court will not anticipate their insufficiency, and go to adopting rules on the subject.

The court will perceive that Garret vs State, and Jones vs. State, above referred to, are the only cases, so far as our inquiry has extended, in which this point has been decided for the defendant, and not an adjudicated case referred to to support them. We think Judge Napton says truly, in McMillons vs. State, that the current of authorities establishes the incompetency of co-defendants to testify in behalf of each other, and the rule has been carried so far as to exclude the wives of co-defendants, jointly indicted and severally tried, from testifying, as will be seen by the authoritis above cited.

III. We perceive no error committed by the court in the giving or refusing of instruction, to which defendant can object.

In the five instructions given at the instance of the defendants, and the first and second given by the court, of its own motion, we find the following propositions often put to the jury, to-wit:

1. If the defendant was arrested by order of the marshal; solely because he had committed a breach of the promise to leave the city within a stipulated time, that the arrest was illegal, and defendant could not be convicted of murder unless express malice be shown.

2. Unless the defendant was arrested in the act of violating law or ordinance, or was found under suspicious circumstances, unable to give a good account of himself, then the arrest was illegal.

3. If the arrest was illegal, the officer making it must be regarded in the light of a private citizen making an assault upon defendant.

4. The law of justifiable homicide is applicable to the case, according to and in the words of the statute.

5. A mere suspicion of a vagrancy will not alone justify an arrest without a warrant, unless the prisoner be in the act of vagrancy at the time, and that an arrest so made will be illegal.

6. If the arrest was made, solely because defendant had committed a breach of promise with the city officers, in remaining in the city beyond the stipulated time, then the arrest was illegal and the jury must find the defendant guilty of manslaughter in the third degree.

7. If there be a reasonable doubt of defendant's guilt, he must be acquitted.

No error is discovered in these instructions to the prejudice of the defendant; they cover the whole defence. No correct principle of law, applicable to the defence, contained in the sixteen instructions refused, is perceived, which was not presented to the jury in those given. And so there was no error committed in refusing them.

The former part of the first instruction, given for the State, upon the legality of the arrest, is based upon the opinion of the court delivered in this case. The latter part, upon the authority of Bower vs. State, 5 Mo., 379, 380; Com. vs. Green, 1 Ashm., 229.

The second instruction given for the State is attempted to be a definition of passion in the law. It is a technical term, signifying the effect which *may* be caused by a lawful provocation: Beauchamp vs. State. 6 Blackf. 309; Com. vs. Green, 1 Ashm. 297.

The above remarks upon the first and second instructions given for the State, are deemed applicable to the third.

Passion does not necessarily lower the grade of the homicide: U. S. vs. Travers, 2 Wheeler C. C., 507-8. Therefore, the legality or illegality of the arrest does not necessarily lower the grade, because this is the provocation or fact from which the law merely infers passion, and so this court have intimated in the opinion above referred to, for it is said, "the legality or illegality of the arrest might affect the degree of guilt." It is contended by the State that the facts in this case clearly show express malice, and if so, the arrest, even if it were illegal

State vs. Roberts, alias Ward.

does not reduce the crime: See the opinion of this court heretofore delivered in this case, and U. S. vs. Travers, 2 Wheat., C. C , 510; 1 Ashm. 298.

The deceased, Hibler, being a watchman on duty in the night time, at common law, had the right to arrest the defendant without a written warrant: Mays vs. Wilson et al., 1 New Hampshire, 53.

The application for a new trial, upon the ground of newly or after discovered evidence, is insufficient, for the following reasons:

1. It does not appear, in any manner, from the record, that Mauro or Shields was a newly or after discovered witness, or that the matter set forth in either of their affidavits was newly discovered. The defendant must set forth by affidavit that the testimony is newly discovered. This fact must be shown affirmatively: Vandervoost vs. Smith, 2 Caines 155; Rogers vs. Simons, 1 Rep. Con. Ct. 143.

2. The defendant swears that Pifer, McDivit, Stocks and Laugherty are newly or after discovered witnesses, but does not mention the name of Mauro or Shields. The motion and affidavit of defendant ought to have been accompanied by the affidavits of the newly discovered witnesses, to-wit: Pifer, McDivit, Stocks and Laugherty; or, at least their statements, stating what they could testify too. The motion will not be granted upon the affidavit of defendant, the party interested: Willer vs. Tres, 1 Tyler 441; Noyce vs. Huntington, Kerby, 282; Whart. Crim. L., 658.

3. The application does not declare such evidence as could not have been secured at the trial by reasonable diligence on the part of the defendant—Whart. Cr. L. 659, authorities there cited.

4. Proof of diligence must be made—State vs. Harding, 2 Bay 267; Com. vs. Drew, 4 Mass. 399.

5. From the nature of the proof alleged to be newly discovered in defendant's affidavit, he must have known of it at the trial. When such is the case. it is no cause for a new trial—Vandervoort vs. Smith, 2 Caine's 155; Roger vs. Simons, 1 Rep. Con. Ct. 143; Hanley vs. Blunton, 1 Mo. 36.

6. The evidence must be newly discovered, and not its whereabouts or applicability; because the law presumes the defendant knew the facts involved in the case as well as the law of the case, and therefore knew what proof he needed; and if he had known of the existence of the evidence, and had used diligence to ascertain the whereabouts of the witnesses, and had endeavored to get the testimony, it would have been grounds for continuance, for which the defendants under such circumstances, ought to have applied.

The defendant was not surprised by the admission of proof tending to show vagrancy. The opinion and decision of this court, in his own case, of which the law presumes he had knowledge, informed him that the question of vagrancy was a legitimate subject of inquiry.

8. Admitting that the proof, tending to estabish vagrancy was unexpected, this affords no grounds for a new trial—Willard vs. Wethorbee, New Hampshire, 118; Bell vs. Howard, 4 Litt 117.

9. The matter must have come to light since the trial, and upon which the party has never been heard—1 Greenl. Rep. 117.*

10. The State contends that defendant must have known of this testimony before the trial, and if so, a new trial will not be granted, unless due diligence be shown—Hanley vs. Blanton, 1 Mo. 36.

11. No due diligence is shown by defendant as required by law. The affidavit of defendant does not contain an averment that due diligence was used by him as required by law—Smith vs. Mathews, 6 Mo. 600.

For these reasons, we think the court did not err in refusing to grant a new trial upon the grounds of newly discovered evidence.

IV. There was no error committed by the court in overruling the motion in arrest of judgment. The indictment sufficiently describes the deceased and the offence committed upon him.

State vs. Roberts, alias Ward.

It is not necessary to set forth the official character of the deceased—State vs. Baker, 4 Pike 56.

The record does not show that there was no preliminary examination in the cause. If this be error, defendant ought to have placed it upon the record.

It is contended by the State, that if there was no primary examination, this affords no grounds for arresting the judgment.

How does the want of a primary examination before a committing magistrate, effect the finding of the indictment and the subsequent proceedings. It is no condition precedent upon which the validity of the indictment and subsequent proceedings depend; nor do they sustain any relationship to each other.

By the law of the land, grand jurors find bills upon their own knowledge, upon the information of officers and other evidence adduced before them. But if the proposition contended for by the defendant is correct, the first duty of the grand juror is to ascertain whether any primary examination has been had, and if not, they cannot inquire into the subject or find an indictment. This rule, if it exist at all, it must apply as well to misdemeanors as felonies. If this be true, the duties of a grand juror are not correctly described in his comprehensive oath that he will well and truly present all matters and things, &c.; but his duties are confined to those cases in which the activity and zeal of some prosecutor has brought about a primary examination.

The primary examination could in no way benefit the defendant at the trial. It is true, that under the statute he has the right to make a statement; but the rules applicable to confessions apply to this statement. It could have been used by the State against him, but could not be used by him in his favor—Arnolds' case 8 C. & P. 621, Roscoe Ev. 61.

If it be true, as it clearly appears to us, that this statement cannot be used for the defendant; that a primary examination cannot be used by him at the trial in any manner whatever; that the indictment and proceedings had thereon, are separate and distinct from the primary examination; that although a defendant may be discharged by a committing magistrate he may, nevertheless, be indicted, tried and convicted for the same offence, we cannot perceive how it is that the want of a primary examination in any manner affects the indictment or proceedings had thereon.

The record shows no such grounds as set forth in the 14th reason for a new trial. If the matter set forth in said fourteenth reason be true, defendant ought to have objected and excepted before the jury were sworn, and placed the error, if any there be, upon the record. The court will presume that the proceedings in the criminal court were regular and proper, unless the contrary appear from facts and proceedings in the bill of exceptions—State vs. Ingram, 7 Mo. Rep. 293.

The record states, that a jury came of twelve good and lawful men, who were duly elected, tried and sworn, &c. By the record it appears that defendant elected to take the jury by which he was tried. He, then, ought not to be allowed to object to the the jury of his own chosing after verdict. Even though there was no list of jurors furnished to defendant, the statute is directory, and the defendant, by going to trial without such list, has waived his right to the same—State vs. Loper, 3 How. Miss. Rep. 431–2.

The principles laid down by this court in Lisle vs. State 6 Mo. 426, seems to apply to this point.

Objections to jurors come too late, after verdict Bellis vs. State, 2 McCord 12. Qualifications of jurors may be a question at the trial, but not afterwards in another court—Cody vs. State, 3 How. Miss, 27.

After jury are sworn in a criminal case, it is too late to challenge—Ward vs. State 1 Humph. 253.

State vs. Roberts, alias Ward.

RYLAND, J., delivered the opinion of the court.

The defendant was indicted together with Richard Jones for the murder of Ephraim Hibler, in the city of St. Louis, in May, 1850.

There was evidence showing that Hibler was a policeman, one of the night watch of the city; that he attempted to arrest the defendant, and was by him killed, by pistol shot, during the attempt to arrest.

The defendant, John Roberts alias John Ward, was found guilty of murder in the first degree; he appealed to this court, and the judgment of the criminal court was reversed and the caused remanded.

It appeared by the record of the first trial, that Roberts had been arrested and put in the calaboose; that on his own application and promise to leave the city, he was discharged, upon the condition that he would leave the city within a short time, say a day or two. That Roberts was seen in the city after the time had elasped; that the city Marshal gave orders to Hibler to arrest Roberts, and that in attempting to execute said order Hibler was killed.

When the case was first before this court, although there was testimony, showing the manner of the killing to be with no such deliberation, that a jury might have thought it was malice; that the act of killing was indicative of a "heart desperately wicked and fatally bent on mischief," yet, we were inclined to suppose, that justice might require the attention of the jury to be called by proper instructions, to the fact of the reason or cause of the arrest. That if they should think, that the cause of the order for arrest, was merely the breach of the promise made by Roberts to leave the city in a few days; that such breach of promise, alone, did not furnish a sufficient cause for the order for the arrest; that the arrest, if on that ground alone, was illegal; and if the killing was not with so much deliberation as to make it murder, even if the arrest was illegal, that then the jury should not find the defendant guilty of murder in the first degree.

The case was again tried, and a jury again found the defendant guilty of murder in the first degree. He moved for a new trial; also in arrest of judgment—both motions were overruled and he again appealed to this court.

The bill of exceptions sets forth the following evidence:

CITY ORDINANCE, 1850, PAGE 407.

SECTION 1. "All able bodied persons, who, not having visible means to maintain themselves, live idly, without employment, or are found loitering or rambling about or wondering abroad, and lodging in groceries,

tippling houses, beer houses, out-houses, bawdy houses and houses of bad repute, sheds or stables, or in the open air, or who shall be found trespassing in the night time upon the private premises of others, and not giving a good account of themselves, or wondering abroad and begging, or going about from door to door begging, or placing themselves in the streets or other thoroughfares, or in public places to beg or receive alms, all keepers or exhibitors of any gaming table or device, all persons who for the purpose of gaming travel about or remain in steamboats or go from place to place, and all persons upon whom shall be found any instrument or thing used for the commission of burglary or for picking locks or pockets, and who cannot give a good account of their possession of the same, shall be deemed vagrants.

SEC. 2. On the trial of any person before the recorder, charged with being a vagrant, it shall be lawful for the city to introduce, in support of said charge, testimony of the general character and reputation of the defendant, touching the offence or charge set forth in the complaint, and the defendant may likewise resort to testimony of a like nature, for the purpose of disproving said charge, and if the defendant, after all the proofs shall have been heard, be found guilty, he or she shall be assessed to pay a fine of not less than fifty dollars nor more than five hundred dollars and the recorder shall enter judgment for such fine and costs, and shall moreover require the defendant to give a bond to the city of St. Louis, with two or more good and sufficient securities, in a penalty not less than five hundred dollars and not exceeding one thousand dollars, conditioned that if the said defendant will, for the space of six months next ensuing the execution of said bond, be of good behavior, and in default thereof, it shall be the duty of the recorder to commit said defendant to the work-house until such security is given, not exceeding six months. Approved March 29th, 1850.

ORDINANCE ESTABLISHING AND REGULATING THE POLICE DEPARTMENT.

SEC. 1. There shall be established a police department to consist of the city Marshal and the officers and privates of the day and night guard.

SEC. 3. The night guard shall consist of one Captain, three Lieutenants, thirty-six privates, and such temporary guards as may be employed as hereinafter provided.

SEC. 4. The city Marshal, *ex officio* shall be chief of the city police, and all the officers and privates, composing the police department shall be in subordination to the city Marshall except in the cases otherwise provided in this ordinance.

Sec. 8.   The chief of the police (in subordination to the Mayor) shall be authorized, whenever, in his opinion, the public service may require it, to take command in person of all the members of the day and night guard, and direct their movements in the discharge of their respective duties, under the regulations of the police department of the city.   He may, whenever in his opinion the public service requires it, detail any number of the day or night guard for any special or particular duty connected with the police service of the city, and he may, in cases of emergency, require any number of the day or night guard to do duty at any time of the day or night.

Sec. 12.   It shall be the duty of the privates to be punctual at roll call at the second station house, to obey punctually and to the best of their ability, the orders of the chief of the police, the Captain of the city guard and the Lieutenants to whose command they may be severally assigned, to remain on their respective beats and not leave the same, except in the discharge of their respective duties.   They shall, to the best of their ability preserve order, peace and quiet throughout the city, they shall arrest persons found in the act of violating any law or ordinance, they shall arrest all persons found under suspicious circumstances, and who cannot give a good account of themselves, and convey all persons so arrested to the station house of the district in which any such arrest is made, and report to the Lieutenant of such district the cause of such arrest, the names of the witnesses and all the facts connected therewith.   The members of the city guard shall have authority to enter any house, enclosure or other place, where a breach of the peace, or crimes, or breach of ordinance has been or is being committed, and arrest the offender or offenders, but shall not enter any dram-shop, bawdy house or other place except in the discharge of their duty.·   They shall cry the hour of night, give the alarm of fire and report all nuisances within their respective beats to the Lieutenant of the district in which said nuisances are found, and attend at their respective station houses at the hour of dismissal, and then be discharged from duty."   "Approved April 1st, 1850."   Which said ordinance first mentioned, and sections of the ordinance last mentioned, read in evidence, were admitted by defendant's counsel to be genuine ordinances, passed by the city counsel of St. Louis in pursuance of the city charter, and in existance and in force at the time this killing took place.

The evidence adduced in the case is as follows:

Dr. Thos. McMartin, witness for the State.—I am a surgeon and knew Ephraim Hibler and attended him in his last illness.   I was called on to visit him about one year ago, about 12 o'clock at night, at a

house on the corner of Second and Almond streets. He was laboring under the effects of a pistol wound, the shot having struck one of his false ribs, and passed through a portion of spleen and cut the bowels in several places, and the passage was lost. His wound was dressed with sticking plaster, which I removed and prescribed some medicine for him. The next time I saw him was at his own house, near Chouteau Avenue, in this city, and continued to visit him until his decease; after his death I conducted a post mortem examination, and found that the ball had passed twice through his bowels; there had been excessive hemorrhage and considerable inflammation; first saw him at north-west corner of Second and Almond sts., at a drinking house. We did not find the ball, only traced it through the intestines. It had entered on the left side, about two inches above the vest, and passed anterior towards the spine and nearly in a horizontal direction, but might have been a little up or a little down. The hole made was about the size of a little finger; the wound was necessarily fatal; do not remember whether any one told him he would die or not; do not think any person had any idea of his living; I have no doubt he died of the wound; he died in St. Louis county, May 1850.

CROSS-EXAMINED.—Saw Hibler, five or six hours before his death; mortification had at that time partially commenced; he suffered a great deal of pain. Dr. Beaumont also attended deceased. There was no external hemorrhage, the wound had been caused by a small projectile. It was some three or four days from the time I first saw him that he died, which was not far from 12 o'clock; did not see the prisoner at that time. Deceased had been struck by but one ball; the *post mortem* examination was made by introducing cathetar, and by cutting; we traced the ball some four inches; a ball passing through the intestines is necessarily fatal.

RE-EXAMINED.—I think that the deceased did not expect to recover, from the first time I saw him.

DR. BEAUMONT, for the State.—I knew a man called Ephraim Hibler, and saw him after he had been wounded; only saw him once, and that was on the evening of the 25th of May; the wound had ranged laterally, and could force my little finger into it. I attended at the *post mortem* examination, and found that the wound was of necessity a fatal one; *post mortem* examination was made on the 27th May; wound was on the left side, and the ball struck and grazed the stomach; passed through the spleen, and allowed its contents to escape into the abdomen, and glanced into the intestines on the right side, and cut the intestines in several places; he died of the wound. (No cross examination.)

State vs. Roberts, alias Ward.

JAMES A. FELPS, for the State.—I am Marshal of the city of St. Louis and have served in that capacity for two years; and am chief of police by virtue of my office, and held this office at the time of this killing. I knew Hibler; he was a member of the night guard of the city of St. Louis at the time of his decease; knew Jack Roberts, and recollect the night Hibler was killed. Roberts had been confined in the calaboose for two or three days, some week or ten days before that time; he was discharged on a promise that he would leave the city; he had been arrested on a charge of vagrancy; the proposition to leave the city first came from Dick Jones; he was to have left the city in a short time, and that was the distinct understanding, not exceeding 24 hours. Several days after, heard that he was still in the city, and gave a general order to the police to arrest him. I wanted him arrested to be tried upon the old charge of vagrancy, and the order was to arrest him to be tried. Hibler came and asked if he should arrest Roberts, and I told him he should, if he remained in the city after a stipulated time; that he was a bad man and a thief. I saw Hibler at his own house, the day after he was shot; he (Hibler) said he was badly wounded; I tried to impress him with a hope of recovery, but he said he had none. When I arrived he had just signed and made his will, and said he must die; I conversed with him, with a view of getting his statement, to be used as testimony on the trial, but did not tell Hibler that that was my design; did not propose to reduce the conversation to writing, and did not do it. Several persons were in the room; we conversed in a low tone; his (H.'s) wife was standing nearest to us; the conversation was conducted by question and answer. When I left him, he bid me farewell, and I never saw him again while alive.

The State proposed to introduce the dying declarations of Hibler, which was objected to on the part of defendant, and objection overruled; to the overruling of which and the admission of the dying declarations, defendant excepted.

Hibler stated, that in obedience to my orders, he had attempted to arrest Roberts; that a scuffle ensued; that Roberts drew a pistol on him and snapped it; that he took the pistol from him, and Jones then told him (Roberts) to feel in his other pocket; that Roberts then drew the other pistol, reached round and shot him from behind, and inflicted the wound under which he then labored; that this occurred at the Marengo coffee house; that he (Hibler) was in good health at the time he was shot, and a stout able man.

The State here proposed to introduce testimony to establish the fact, that at and before the time of the attempted arrest, Roberts had been

guilty of acts constituting vagrancy; to the introduction of which, on the part of the State, defendant objected, which objection was overruled and the defendant excepted.

I had seen defendant previous to his arrest; he had not been long in the city; never saw him do any work; he (Roberts) is an able bodied person; has seen him on Almond street, and at the house of Liz Hollis, a house of bad repute, that is, a bawdy house; has never seen him engaged in any pursuit, and knows of no property or visible means of support he has; first saw him in this city about one year since. Hibler's beat was in the lower part of the city; Almond street was the dividing line, but am not now certain, whether his beat lay on the North or South side of Almond street. If a watchman is in pursuit of a person, he can follow and arrest him under the ordinance wherever he runs within the city limits. When I went down to see Hibler, I did not know what his condition was, and conversed with him with a view of collecting testimony. Watchmen had nothing at that time by which they could be designated but a club or staff. Don't recollect how long after his arrest it was that he saw Roberts. All this took place in St. Louis county in May 1850.

CROSS-EXAMINED.—Think I knew Roberts about one month previous to his arrest, and that my first acquaintance with him was at Liz Hollis' house. I had him arrested first, because I heard he was walking about the Ferry. Police officer Cook, arrested him merely because he deemed him a vagrant, he (Roberts) was never tried on that charge. The first application for his release came from Jones, who is the friend of Roberts; he was released on consent of Recorder Dougherty and City Attorney Anderson, provided he would leave the city within a given time. When he was first arrested there was a pistol taken from him; don't remember who was present when he was discharged, nor whether I returned him fifty cents or any money; think the time he was to leave the city was within 24 hours. At the time of his discharge I ordered the police to arrest him, if found in the city after the stipulated time; the order was verbal. I also instructed Hibler to arrest him if he was found in the city after the stipulated time; think I assigned a reason, at the time, for the arrest, but am not certain; don't recollect what that reason was. I did not see Ward from the time of his discharge to the time of killing Hibler; recollect of no new charges being preferred against him during the interval, and there was no new evidence of his being a vagrant. I knew of no specific charges against Roberts, of my own knowledge, except the charge of vagrancy, under which he was arrested. Hibler asked me if I should arrest Roberts, if he came across

him; said he had seen him on his beat. H's. beat was on the south of Almond street; at any rate Almond street was the dividing line between the beats; there is no power that I know of for watchmen to serve written warrant, and there was none issued; have known of warrants being issued in Recorder Hyde's practice ; he went out of office on the 2nd Monday in April, 1850. I know nothing about where Roberts was after the expiration of the time he was to leave the city; think a man can reform and cease to be a vagrant; don't recollect whether Roberts was charged with swindling a countryman, and know of no evidence to substantiate that charge. Persons are arrested under the vagrant act only, when no crime has really been committed except vagrancy; don't recollect that I even enquired as to Roberts' visible means of livelihood; never made any attempt to find out whether he had any means of support; never asked him whether he had any money or property; don't remember of making any such enquires, after his first discharge. I have occasionally taken the liberty of telling persons to leave the city after a given time ; commonly threaten to arrest them if they do so; have done so before this ; do not consult with the Recorder when I do so. Officers Page and Cook arrested Roberts the first time ; they are salaried officers; after his first arrest he was detained in the calaboose 7 or 8 days before he was discharged, as near as I can recollect; I think he was reported to the Recorder after his first arrest; don't recollect of his having been brought up before the Recorder; did not apply for a continuance and cannot say whether the case was set on the docket or not; no order of court was made for his discharge, the reason he was discharged was the vast amount of business before the Recorder at that time, and his promise to leave if discharged; all policemen are bound to carry clubs, and only carry them when on duty, but the police generally go around; generally carry pistols when on duty, but don't know whether Hibler was armed with a pistol on that occasion. I saw H. on the evening of the day following the on which he was shot; only saw him once; don't recollect whether H. stated any thing about a warrant; my impression is that H. stated that Roberts would die before he would be arrested; don't remember the time of night it was, don't recollect any thing further in regard to that conversation.

RE-EXAMINED.—Roberts was confined in the calaboose not less than eight or ten days before he was discharged, and am certain that the time of probation had expired at the time of the attempted second arrest.

JNO. LAMBERT, for the State.—I was present at the time H. was shot; he was shot at the Marengo coffee house, on the corner of 2nd and Al-

mond streets; there are two rooms down stairs in this house and the counter was east and west in the front room. I was sitting in the door at Mr. Kincaster's on the east side of 2nd street, with Mr. Rose; saw Mr. Monastes, Hibler, Hahn and Allen come up, and then saw Hibler and Hahn run across the street in the Marengo coffee house; followed them across and entered the house by the door on Almond street, and passing through the bar room went into the back room in the western part of the house. I think I saw Hibler and Hahn in the back room, holding the defendant, who had his back against the western wall of the room; they held him and I saw a pistol in defendant's hands, holding it with both hands between his legs and refusing to go. (A large pistol here being shown to witness, he says it is the one defendant had between his legs.) Bill Cluxton went up to Roberts and asked him to give up the pistol, and at first he said he would, but made no motion to deliver it. Cluxton went into the bar room and defendant swore he would not go; then saw Dick Jones trying to open the back door; he was a long time at it, but finally opened the door and stepped out, and Hibler and Hahn pulled Roberts out into the middle of the room when he snapped a pistol at Hahn; Hahn then knocked him down with his police club, on a small bed that was in the bar room, after which Dick Jones jumped in and took hold of Hahn. The police then asked Monastes and myself for assistance; I assisted and caught Dick Jones and pulled him off of Hahn, which gave Jack Roberts a chance to get up. In the scuffle the pistol was taken from Roberts; after Roberts had got up, Jones came up to Roberts and asked him "where his other one was;" Roberts then said "I ain't got it." I pushed Jones back, who then put his hand in his own pocket and came up to Roberts and put his hand in his (Roberts') coat pocket, the left one, then dropped Roberts' coat pocket and stepping back said to Roberts "feel in your pocket." I, Hahn and Hibler then pushed defendant into the bar room, where he got between the counter and the wall; the space between the two is about two or two and a half feet; after they got there I stepped into the middle of the room and Hibler again asked me to help him. Hibler told defendant that he knew that he (Hibler) was an officer and bound to do his duty, and to go along without resistance. I stepped up to defendant, who held the pistol in his pocket; as I stepped in front of him, defendant said "by God I'll shoot," and then turned his hand, shot Hibler and Hibler fell. Hibler was standing with his front or left side towards Roberts' left side; the shot was fired from the left coat pocket of defendant, the left hand and pistol being in the pocket and the right hand in outside grasping the muzzle of the pistol, and turned it slowly round to bear upon Hibler;

in turning the pistol he seemed to take his own time. (Another pistol here being shown, witness says it is the one afterwards taken from defendant.) Defendant then struck Hahn across the face with his pistol, and I then asked Hibler for his club, took the club off his arm, and struck defendant across the head with it, and knocked him down on his knees; then a scuffle ensued and Mr. Hahn knocked him about the same time; defendant then ran, and I saw Dave Monastes standing on the corner, and called to him to stop him, that he had killed Hibler; Monastes pursued and overtook him in front of Rose's shop and knocked him down with his fist. Rose came up and struck defendant with a club, some 6 or 7 times after he was down, then picked him up by the top of the head and swore he would cut his throat; the officers then came and took the defendant to the calaboose. When I first saw defendant the officers were persuading him to go, and never saw them use any violence until he snapped the first pistol at Hahn in the back room, and then Hahn struck. While they were in the back room, Jones went out and returned again; it was after Jones came in that they called on me to assist; did not see Liz Hollis that night and she was not in the room; defendant took his own time in turning round to shoot; the minute after, he shot, and had hardly got the words out of his mouth before he shot. Hahn died of cholera, after Roberts shot, and after Roberts struck Hahn with the pistol, Hahn struck him, when Roberts ran 40 or 50 yards down second street; think Jones was in the bar room until Roberts shot; had not known Roberts except to see him go through the streets; not acquainted with him; had known him about a month before; saw him at Liz Hollis' house; know nothing about that house and only saw Jones there; Jones was a long time opening the back door; saw nothing in his hands; they are able bodied men; know of no business they follow, nor of any means of support that they have. All this occurred in St. Louis county on the 25th day of May, 1850. The police who went into the coffee house came up 2nd street; Rose took the first pistol from Roberts in the back room; Roberts had a light colored coat on, like a sack, with straight pockets in the sides; Hibler held Roberts by the left coat collar when he shot him, and Hahn was standing against the wall to the defendant's right.

CROSS-EXAMINATION.—This occurred between 10 and 11 o'clock; Verdinal, Mr. Cozineau and Bill Cluxton were in the house; they were standing at the counter and Bill Cluxton was standing near the middle of the counter, the others behind the bar; don't recollect of seeing any one else there; did not see a boy by the name of Pifer; no one else was in the back room but the two officers, Roberts and Jones; Monastes and

Allen did not go into the back room; heard no conversation in there; the officers held Roberts by the collar and shoulder and were speaking to him.   Roberts said he would not go, he would die first; they pulled him into the centre of the room and then he snapped the pistol in the back room, but this is merely an opinion as to the centre of the room.  Jones, when he went out, was not gone over a minute, and came back by the same way he went; he must have been working at the door some three minutes before he got it open; perhaps four or five minutes.  Hibler had his club, but did not take notice what position he held it in; he was holding defendant against the wall; then I pulled Jones off, and Roberts rose to his feet; heard nothing said about a warrant, and if any thing was said did not hear it, it might have been said; Cluxton then went back into the bar room; Cluxton went out twice; I was standing about five feet fom Hibler, in front of him, when he was shot; Hibler had his right side to the counter; when Roberts shot he held the pistol in both hands, and did not stretch it out, the officers were coaxing him to go along; Jones was standing at the central door.   Hibler was a middle-sized man.   I reside in the city and follow the river; never knew any thing against Roberts, and saw him at the boxing saloon; I am going on the watch.

DAVID MONASTES, for the State.—Knew Hibler, and met him on the night in question, coming up the street; met with him between Almond and Poplar streets, along with Hahn, and we started up the street together.   We stopped on the corner, and Hibler told us to hold on, and went over to the Marengo coffee house on the north-west corner of Almond and Second streets; Hahn followed him; Lambert and Rose were sitting on north-east corner of Almond and Second streets; they went over and then we went over and saw defendant in there.   I stood inside of the door and Hibler told Roberts that he must go along with him as he was going to take him to the calaboose, they then got into the corner next to the door, in the backroom, and Roberts stood up in the corner.   Hibler told defendant that he must go with him, and he (defendant) said he would be *damned* if he would—he would die first. Hibler was on one side of him and had hold of his arm, and Hahn was on the other; Roberts was standing bending over, and had something in his hand between his legs, the officer called on some persons to assist him, and Bill Cluxton stepped up and asked defendant to give him up the pistol, then I went out of the back room and stood on the side walk some minutes, and heard noises, as if they were coming out with him; then ran into the house and saw Hibler lying by the counter.   I then went out again, stood on the side walk, and heard a voice hallooing

State vs. Roberts, alias Ward.

"catch him;" I started after him and overtook him in a short distance; struck at him and missed him, then struck at him and knocked him down; by this time the rest came up, and they took him to the calaboose. At the time of the arrest, Hibler told defendant that he was an officer, and bound to do his duty; did not see Jones have anything in his hand; did not see any licks struck in the back room; don't know whether I or Cluxton got the pistol from defendant; struck defendant with my pistol when I knocked him down in the street; knew defendant some time, and never saw him do any work; never saw him follow any industrial pursuit; saw him go into Liz. Hollis', a house of ill fame, a number of times. Defendant is an able-bodied man, and I know of no means of support he has; Liz. Hollis' is a house of bad repute; saw defendant go into the "Break of Day" coffee house, kept by Jack McDivit; did not know when Hibler and Hahn went across the street what they went for; think Roberts was just coming to the door; saw Liz. Hollis on the side walk on the north side of Almond street; Roberts was in the corner at the time Jones opened the door; Hibler and Hahn's manner, in making the arrest, was very kind; Hibler had his club and remained at the coffee house; the large pistol is the first I saw on defendant; have seen defendant frequently at Liz. Hollis', and about coffee or drinking houses, and know of no means of support he has.

CROSS-EXAMINATION.—Hahn followed Hibler across the street; Lambert and Rose followed him, and I soon after; all entered the house within a minute of each other; Cluxton was standing against the counter; I went immediately to the door between the two rooms. When I went to the door, Hibler, Hahn, Lambert, Ward and Jones were in the back room, and Bill Cluxton passed by me; Roberts was standing next to the door when I first saw him, with an officer on each side, and stood there a few minutes; heard some one call for assistance; think it was Hibler; then there was a struggle; Roberts was resisting; heard Cluxton say something to Roberts, but don't recollect what; did not hear any reply to Cluxton from Roberts; no light in the back room; front room was lighted with gas, and light was a little out from the counter; when I left, Cluxton was still in the back room. I did hear something said about a warrant when I was in the back room; Roberts spoke about it, but don't know what was said; don't recollect whether the officers made any reply; believe one of the officers said he had received orders from the marshal to arrest him; don't recollect when this conversation occurred, but it was sometime when they were in the back room. Hahn had a club, but don't recollect the position in which he held it; he had one hand on Roberts; saw neither Hibler nor Hahn have a pistol; Jones

was fingering at the door just behind Roberts and the watchman; left Roberts in the back room and passed out on the street; don't know that Jones went out of the back door; did not see Jones in the bar room as I passed into the street. I stopped some place in the neighborhood; did not go back until Hibler was shot; there was a good deal of noise made; do not know whether it was in connection with the noise that the pistol was shot or not; did not see Liz. Hollis enter the house; don't recollect Roberts pulled into the middle of the floor, saw no blows; did not see a bed in the back room; saw Roberts lying partially down on his elbow. I was the first one who struck Roberts after Hibler was shot; so far as I know, did not strike him a second time. When the others came up, they struck defendant with clubs; saw no one catch him by the hair, and heard no one threaten to cut his throat. I was standing in the crowd while these blows were given; am a blacksmith; never saw the defendant committing any crime; was a member of the independent police, and have not since been on the police; Roberts was closely watched as a suspicious character, by the independent police; saw defendant at the jail, and don't know whether McDivit employed him to keep bar or not; saw defendant carring a basket before his arrest.

WILLIAM CLUXTON, for the State.—I was present at the time Hibler was killed; went to the Marengo house to examine a $5 bill to see if it was counterfeit; don't know whether Roberts and Jones were there before I got in or not. Before I got the detector I was called on for assistance by the watchmen; the watchmen had hold of him and were telling him to go, and he swore he would not go; Roberts' face was towards the back part of the room; they had hold of him and were telling him to go along, and he said he would not; Roberts held his hands before him, but don't know what he had in them. I went and asked him for the pistol, and told him he had better go down civil, and he said he would, then went into the bar room and heard murder called in the back room and Jones spoke and told them not to kill the man. Jones was busy opening the door; Roberts was rather to the front near the centre of the room; don't recollect stating on the former trial that I heard a pistol snap. I went into the bar room, and the next time I saw defendant he was on the bed in close quarters with the watchman; Hahn had hold of his collar and Hibler was before the defendant; saw no more violence than was necessary; picked Hibler up and put the fire out; the fire from the pistol caught to Hibler's clothes; did not see any arms in possession of the watchman.

CROSS-EXAMINED.—I went into the back room twice; the two policemen, Roberts, Jones and Lambert were in there; don't recollect that I

saw the police officers go into the house, nor of seeing any one else come into it; lived about half a square from the Marengo coffee house, and kept a coffee house; had been in the M. house but a short time when I heard the call for assistance; heard a kind of squabble and could see into the back room. It was Hahn who called for assistance; Roberts did not speak to me until I spoke to him; don't recollect any remark he made but what I have mentioned; did not offer to take the pistol, suppose the cry came from Roberts; did not speak to him when I went back the second time; did not hear him say any thing the second time; made no attempt to get the pistol after speaking to him the first time. Roberts never said he would not give me the pistol; did not see any pistol at all in the back room, think I did hear Roberts make a remark about a warrant; did not see Jones do any thing more than open the back door; did not assist to take defendant out of the back into the front room; did not see the pistol; the shot came from the direction of the defendant; don't know whether Roberts shot the pistol or not; there was a good deal of excitement prevalent about that time; don't remember whether the back room was lighted or not.

ELIZABETH HOLLIS, alias ROYCE, for the State.—I live at 74 Almond street on the south side; recollect the difficulty which resulted in Hibler's death; had not known defendant a long time, not more than a month; he came into my house with Jones and others; never knew of his having any business or means of support; did not know much about defendant, but knew more about the others, he came to my house very often in the day as well as night time. I had a bar there; never shut up till 12 or 1 o'clock; never saw the defendant with any kind of men other than those who do nothing for a living. At that time I knew all of them; never saw any burglarious instruments about them, but not so with gaming instruments; never saw any gaming instrument about him except a pack of cards; saw Hibler when he was shot and when he fell; Roberts then ran and heard him halloo murder; met Jones in the door, coming out of the back part of the house and going to the front not long before the shot. The watchman had hold of Roberts; have seen Roberts at Sarah Chandler's, called the Robber's roost, a bawdy house, a very low house; saw the men the evening before; they had said they never would be taken by watchmen; saw them at Sarah Chandler's in the forenoon; saw them also when they were going to the Marengo house; have seen Roberts with a pistol and slug shot too in my house; Roberts and Jones were together when they passed my house; showed me their weapons and said they would not be taken by any watchmen nor leave the city.

CROSS-EXAMINED.—They came to my house to get something to drink and to see the ladies; saw defendant drink; sometimes he paid and sometimes others paid; did not see him have a great deal of money; never saw him working; could not describe his dress; saw him with both kinds of company, good and bad. I was standing partly in the door of a house on Almond street that night, and had come from my own house; Hibler was standing somewhere near the door on Second street, and fell into the house towards the counter; Roberts was standing near the door; there was a pretty large crowd there; Cluxton and Monastes were standing at the door and I then went home and got rags and put on Hibler; Roberts went out of the door on Almond street; Jones passed into the bar-room a minute or two before the pistol was shot; heard nothing about a warrant; do not recollect the time nor any exact words that were spoken; do not know how long time it was from the time I saw them pass to the Marengo house until the affray. My house is half a square above the Marengo house on Almond street; did not see, in going to the Marengo house, any person that I recognized; heard defendant halloo murder as he was running; the crowd were all running; saw one of them strike the watchman; think it was with his fist; saw the pistol shot, it was on the left side; saw Roberts distinctly when he shot; he was standing up and Hibler had hold of his arm; don't know which arm it was; have not got a good memory and don't recollect things long passed; saw Jones with a pistol that night; don't know whether she saw Cluxton with it or not.

WM. ROSE, for the State.—Was present when H. was killed; was going down towards home on Second street, when I saw two men sitting on the door, Lambert and Allen; they stopped me and I sat there some fifteen minutes. Two watchmen stood on the other side of the street, and they ran over to the Marengo house and we followed them; went into the house and into the back room, saw there two watchmen, Hibler and Hahn, who wanted to arrest Roberts, Jones was standing in the door going into Almond street; the watchmen wanted to arrest Roberts, and said they had an order from the marshal, and Roberts said "by God save my life I won't go." Jones got a bunch of keys and tried to open the back door, and the watchman gave him the best words to go along; it was hard work to get Roberts out, and they called on Monastes to help them, saying that he was a citizen and bound to do so. Monastes came up, passed me and defendant snapped a pistol and Monastes *emigrated*. Jones got the door open, then ran up and struck Hahn with a pistol, and Roberts made an effort to get out, but they held him fast and drew him into another corner. Hahn told me, in German, to help, help,

4

we need help, and then I stepped up and took the large pistol from Roberts, put the pistol in my pocket. Hahn then told me to get the other pistol, and I ran at Jones and Jones snapped another pistol at me, turned round and went into the front room, and Roberts twisted behind the counter, and then said, let me alone or I will kill you, and then "boom;" and then I went up to Roberts and took him by the hair and pulled him by it on the floor. I had a watchman's club; Cluxton then stopped Hahn and said that was not the way to treat a man; then Roberts drew another pistol and held the pistol up, and I jumped in the room and Roberts stepped out the door on Second street, and then I went out after him and knocked him down on the other side of the street; then I brought him to the calaboose; saw Jones have a bunch of keys. Hibler told Roberts he had better go, he had an order from the marshal to take him; did not see any body try to hit him; just held him by the hand; did not hear Jones say any thing. Jones went up twice to Roberts; don't recollect what Jones said about the pocket; never knew defendant except he saw him pass on Second street; only saw him once or twice; don't know of any work he did; never saw him with any burglarious instruments about him.

CROSS-EXAMINED.—Roberts, Jones, Hibler and Hahn were in the room, and don't know whether I or Lambert came in first. There was no light hanging in the front room before the door that leads into the back room. They were standing on the north side of the door against the wall; Jones came up to Roberts after he opened the door; don't know whether Roberts had any thing in his hand; I took the pistol out of his hand. Hibler called for help, called on Monastes. Heard nothing said about a warrant. Jones snapped a pistol and then ran out of the room; did not see him after that. Jones struck Hahn with a pistol; think this was the one; Roberts cried "let me alone, let me alone." About three minutes after he went in the house till the shooting took place. It was between 11 and 12 when I first entered the house; the officers did not say for what offence the arrest was to be made. Jones never came back after he first went; saw Jones open the back door with keys; he did not go out then, but tried to rescue Roberts from the officers. Did not see Cluxton in the back room; did not hear Roberts ask them for the warrant. Roberts said "let me alone if you don't I will kill you;" saw the pistol in Robert's hand when he shot; he had hold of the pistol with one hand when he shot. When I first struck defendant I was inside of the house and had a club. Hahn and myself struck Roberts after he shot Hibler; I also struck him outside of the house; I first struck him outside of the house and struck him several times; Roberts did not get up again

and run, but took him right away to the calaboose; did not see any person knock him down after that; did not see Liz Hollis that night that I know of; know Liz Hollis; she keeps a bawdy house; saw defendant with lewd girls; saw him twice; don't know the first time I saw him before this occurrence; have lived in that neghborhood for six years, and people generally say Liz Hollis keeps a whore house; may have heard people say she will lie; have never been on the watch. I took the defendant to the calaboose that night; the officer told me to do so. I did not see defendant that night before I went into the coffee house; it was all still about the house when the officers entered; saw the bunch of keys with which Jones opened the back door; there was a lock on the back door; I saw the lock.

Jesse L. Page, for the State.—I know the defendant; am on the police; recollect the night on which Hibler was shot; had known defendant a month or two before this occurrance; never saw him do any work; have seen him about coffee and bawdy houses; don't think I ever saw any gaming device on him; have seen him sitting about and drinking in coffee houses. I arrested him the first time; he had a pistol and some keys about him; arrested him at Sarah Chandler's; arrested him on a charge of vagrancy. I believe the small pistol is the one I found on him; don't know what kind of keys they were; but think they were trunk keys; don't know that he had more than one key; don't know of his having any means of livelihood.

Cross-examined.—Knew Roberts, I think, one or two months; think I had seen him twice before the arrest; think I saw him on Almond street; never saw him in any other coffee house. I knew him about a month or six weeks before Hibler was shot. It was about two weeks from the time I arrested him to the time Hibler was shot; he was left in the calaboose one or two days; I put him in on Sunday morning, and think he was turned out on Monday night; don't think I saw him from the time he was released until he was re-arrested; only saw him twice before his first arrest; did not search his lodgings; searched him and found money on him; think he had a ten dollar bill and some change; don't know if any money was returned to him; think defendant was shown to the police and that they had orders to arrest him if he did not leave the city in a given time; did not have any warrant when I first arrested him, and did so on suspicion; did not know of his having done any particular unlawful act, and was not doing any thing when I arrested him; he was arrested for vagrancy; did not make any inquiries as to how he supported himself; never heard any others speak of his support but police officers; don't know whether the pistol was returned to him or not.

PETER H. COOK, for the State—Knew defendant slightly; was a day policeman at the time of Hibler's death; my first acquaintance with him was on Almond street; recollect Hibler's death; knew defendant for two or three months before that time; never saw him engaged in any employment; saw him at Liz Hollis' several times, also at Sarah Chandlers. On one accasion I saw Jones, Ward and several other on the levee; concealed myself and saw a countryman coming down who came to Jones; they had conversation together and the four went off together; they went into a coffee house; after that Mr. Felps gave orders to have them brought down.

CROSS-EXAMINED—Don't know how long I had known defendant before the death of Hibler; I was present when he was searched; he had a pistol; some money and a bill which was pronounced bad; don't know whether the money was ever returned to him; could not state the denomination, but think it was a $2 bill; got a key from him, it was traveling bag key; searched his lodging; he lodged at Jack McDevit's; found nothing but some clothing; never saw any gaming device about him, never saw him committing crime on the levee; had not been on the police a year at the time; am in the habit of looking on persons with suspicion, especially strangers; have seen him riding out with ladies from Liz Hollis'; have kept Ward's company and drunk with him.

JNO. B. COZINEAU, for the State—Recollect the night Hibler was killed; was present at the time; Roberts and Jones came into the Marengo coffee house, and asked for a drink; they drank, paid for it and went out; the watchman came, and they came back and went in the back room. I went in and saw Hibler have hold of Roberts; Hibler told him he wanted him to go with him; Roberts said he had not the power to take him, that he would die before he would go. Roberts came into the middle the of room and tried to get away; he then tried to shoot. I came into the front room, got a match and returned and saw Roberts on the bed; I then lighted the lamp in the back room, and then some person said don't kill him, and Ward tried to get away. Hibler then took him into the bar-room, saying, "come on, come on;" Roberts shot and Hibler fell; saw Roberts' hand in his pocket and saw him shoot; somebody struck at Roberts and hit me on the head.

CROSS-EXAMINED—Jones, Roberts, Hibler, Lambert and myself went into the bar-room; saw the watchmen enter back room. Jones asked them to show a warrant, but they did not produce any; did not see any person attempt to take the pistol from Roberts: think I saw Cluxton in the back room once; did not hear him say any thing; the room was quite dark when they went in there; saw Jones try to open the back

door which was shut; there was a key in the door: did not see Jones go out; saw Jones when I went in there, but after I lit the gas did not see him any more; did not see Jones strike any person, nor any person strike Roberts. When Roberts was on the bed some one said "don't kill him;" don't know who it was; saw Hibler and other officers take Roberts in the other room. At the time Roberts shot, Hibler was pulling him by the collar, saying, "come on, come;" don't know if the other officer had hold of Hibler, (Roberts, alias Ward,) then. Roberts shot from his pocket; I was standing on his right side when he shot; sure it was from his left pocket; saw the fire on his coat. Hibler was shot on the left side and was holding Roberts with his hand; did not see Liz Hollis there that night. Hibler was taken into the back room after he was wounded. I should have seen Liz Hollis if she had have been in there. Hibler staid there all night; saw no blood on Hahn's face before Roberts shot; did not see Rose there that night; think I should have seen him had he been in there; did not see Dick Jones in the bar-room after he went out the back door; one of the watchmen put his hand on Roberts' arm; Roberts told him to take it off; he said he would not, Roberts said he had no authority to arrest him, and asked him to show his papers; Hibler said he had none, and Ward said he would die before he would go.

RE-EXAMINED—Staid at the house all the night that Hibler was shot; did not see Liz Hollis there; Hibler talked gently to Roberts, and pulled him gently; saw Hibler when he fell.

G. D. VERDINAL, for the State—Saw Roberts and Hibler at the time of the arrest; was in the house at the time; saw Roberts run in the back room; told the officer to let him go, that he had no warrant to arrest him; said if you don't let me go I'll shoot; saw Roberts as he held on to the bar; heard the shot, said you have not got any order to arrest me; saw Jno. Lambert and Rose there. Roberts came into my house, and as he put his foot on the step the watchman ran into the back room; own the Marengo House; there is a door leading into the yard; no lock on the outer-door; there is a lock and no key on the door leading into Almond street, no lock on the back door; had no lock on it at that time; did not know Hibler's beat; know Liz Hollis but did not see her that night; she did not come into my house at that time; saw watchman have a stick and that is all; saw some people strike Roberts after he had shot Hibler; I did'nt see Jones at all; back door locked with a key always in it; saw Monastes, heard call for help and Monastes ran.

Upon this state of facts the court gave the following instructions, asked for on the part of the State :

1. If the jury believe that the deceased, Hibler, at the time of the killing was a policeman, by virtue of any ordinance of the city of St. Louis, passed in pursance of the city charter, and that the defendant at the time Hibler arrested or attempted to arrest him was found in the city of St. Louis under suspicious circumstances, or was an able bodied person, not having visible means to maintain himself, lived idly, without employment, or was found loitering or rambling about or wondering abroad and lodging in groceries, tippling houses, bawdy houses and houses of bad repute, and that it was made the duty of said Hibler, as a policeman, by any such ordinance, to arrest such persons, and that in pursuance of his duty, Hibler in the night time, while on duty arrested or attempted to arrest the defendant in the city of St. Louis, using no more force or violence than necessary to make the arrest, then said arrest or attempted arrest was lawful and valid, although Hibler may have had no written warrant; and if the jury find that under the circumstances the defendant resisted Hibler, knowing he was a policeman and killed him, as charged in the indictment, with intent to kill him, and that defendant did the deed in malice at the time the act took place, and also, that before the act took place the defendant intended to kill Hibler, this is murder in the first degree, and the jury ought so to find.

2. Passion in law signifies a heated state of the blood caused by a lawful provocation. If Hibler had authority to arrest defendant, and made the arrest in a proper and lawful manner, and did nothing to defendant but follow and arrest him, this is not a lawful provocation, and the jury cannot infer passion from such arrest.

3. If the defendant, at the time Hibler and others arrested or attempted to arrest him, was a vagrant within the meaning of any ordinance, passed by the city of St. Louis in pursuance of the city charter, and that James A. Felps was marshal and chief of the police of said city and that said Hibler was a watchmnn under any ordinance of said city and by virtue of his said office, Felps had the power to order Hibler to arrest the defendant because of his being a vagrant as defined by ordinance, and did so order, and that Hibler in obedience to such order as a policeman arrested or attempted to arrest defendant in a proper manner, using no more force than necessary to perform his duty, and defendant knew Hibler was a policeman, then said arrest or attempted arrest was valid, although done without written warrant, and does not amount to a lawful provocation and so the defendant cannot infer that the defendant was in a heat passion because of the arrest, which the court granted, to which the defendant accepted.

The following, also, were given, at the instance of the defendant:

State vs. Roberts, alias Ward.

4. If the jury believe from the evidence, that the arrest was made in pursuance of an order of the marshal of St. Louis, that the officers of the watch must arrest the defendant if they found him remaining in the city after the time within which ordered to leave, and for that reason alone, then the arrest was illegal, and they cannot convict of murder unless they are satisfied from the evidence that there was express malice in the case.

5. If the jury believe from the evidence, that the defendant, at the time of the arrest was not in the act of violating any city ordinance or law, and was not found under suspicious circumstances, and unable to give a good account of himself, then the arrest was illegal.

6. If the jury believe from the evidence, that the arrest was illegal, then the officers making the same must be regarded in the light of a private individual citizen making an arrest upon the defendant.

7. The jury are instructed, that homicide shall be deemed justifiable when committed in defence of one's person, when there shall be reasonable cause to apprehend a design to commit a felony, or to do some great personal injury, and there shall be immediate danger of such design being accomplished.

8. That the mere suspicion of vagrancy shall not alone justify an arrest without a warrant, unless the prisoner be in the act of vagrancy at the time, and that an arrest so made will be illegal.

The court, on its own motion gave the following instructions.

9. Gentlemen of the jury : There is no situation in life so pregnant with responsibility as that of a juror, whose duty it is, to pass upon the life or liberty of a human being; nothing so unpleasant and nothing oftentimes so difficult : you will not permit the social condition of the accused to bias your minds in coming to a conclusion. He is in all respects, entitled to a fair and impartial trial, and if, after weighing all the testimony in the cause, you entertain a reasonable doubt as to the guilt of the accused, you ought, in that case acquit the defendant.

10. If the jury are of the opinion that the *arrest* was made solely because the defendant had committed a breach of the promise with the city officers, in remaining in the city limits beyond a stipulated time, then the arrest was illegal, and you will find the defendant guilty of manslaughter in the third degree, and assess the punishment to imprisonment in the Penitentiary for a term not less than two nor more than three years, or by a fine not less than five hundred dollars, or by imprisonment in the county jail not less than six months, or by both a fine not less than one hundred dollars and imprisonment in the county jail not less than three months.

The following were also asked by the defendant, but were refused by the court:

1. If the jury believe from the evidence, that the arrest was an illegal arrest, and that the defendant in resisting the same had just cause to believe himself in danger of being killed, or in danger of receiving great bodily harm, and could not prevent the same by escape or otherwise, they must find the defendant "not guilty," unless they are convinced from the evidence that there was "malice" on the part of the defendant.

2. If the jury should be of the opinion that the arrest was made, solely because the defendant had committed a breach of the promise with the city officers, by remaining in the city limits beyond a stipulated time, the arrest was illegal.

3. If the jury believe that the arrest was illegal, and that the defendant committed the killing in resisting the arrest and because of the same, then they cannot convict of murder.

4. If the jury believe from the evidence that in resisting the arrest, the defendant first "retreated to the wall," and only shot when escape was cut off, and that the defendant had just cause to believe himself in danger of great bodily harm, and that he shot, not from malice, but to defend himself and to prevent the arrest from being effected, and shall also believe from the evidence that the arrest was illegal they are bound to acquit.

5. The words used in the statute law, defining the crime of murder, to-wit: "wilful, deliberate, and premeditated killing," are used in the same sense and have the same meaning with the words "malicious killing," as used at common law: "Decs. Sup. Court."

6. If it shall appear to the jury "upon the trial of any person indicted for murder or manslaughter, that the *alleged homicide* was committed under circumstances, or in a case where by any statute, or the *common* law, such homicide was justifiable, or excusable, the jury shall return a general verdict of not guilty : R. S.

7. That an illegal arrest, places the officers making it, upon the same footing with any other trespasser upon the person, and where great bodily harm may be reasonably feared, an illegal arrest may be lawfully resisted, even with a deadly instrument, where no means of escape are left.

8. The premeditated homicide is not necessarily malicious, but that the premeditation must also include a design of doing an illegal act.

9. If the jury believe from the evidence that the arrest was made in pursuance of the order of the marshal, and that the order of the mar-

shal was given because he, the defendant had not left the city within the stipulated time, then the arrest was illegal.

10. In determining upon the indictment that operated upon the police to arrest the defendant, Ward, at the time of the homicide, the jury shall consider the orders given to the police by the marshall, and if the jury believe from the evidence that the cause for the arrest was the breach of promise on the part of the defendant, to leave the city within any given time, then the attempt to arrest was illegal, the police officer attempting the arrest was a trespasser, and the killing, if done in resisting, or under the provocation of such arrest was not murder.

11. If the jury believe from the evidenc, that the attempt to arrest defendant was on a charge of violating some law or ordinance of the city of St. Louis, not amounting to felony, then, in order to justify such attempted arrest to defendant, Ward must at the time thereof have been found "*in the act of violating*" such law or ordinance, and if defendant Ward at the time of such attempted arrest was not in the act of violating such law or ordinance, such attempted arrest was illegal, and the killing of such officer in resisting such arrest, and under the provocation thereof, was not murder.

12. If the jury believe from the evidence, that defendant Ward was arrested by officer Hibler on a charge of a violation of an ordinance of the city of St. Louis, entitled "An ordinance concerning vagrants," and that said Ward, at the time of such arrest, was not found in the commission of any act constituting vagrancy, then in that case such an arrest was illegal and the killing the officer in resisting and under the provocation thereof was not murder.

13. The order of a superior officer will not justify the making an illegal arrest, notwithstanding that it is the duty of policemen by ordinance to obey the commands of their superior officers.

14. If the jury believe from the evidence that the homicide was committed in resisting under the provocation of an illegal arrest, it is not murder, though the defendant at the time of doing the deed intended to kill Hibler, provided there is no evidence of express malice.

15. If the jury believe from the evidence that the arrest was made in pursuance of the order of the marshall, and that alone, then it cannot be justified by showing that the defendant was a vagrant at the time, but the legality of the arrest will depend on the legality of the order from the marshal.

16. If the jury believe from the evidence that there is a reasonable doubt of the guilt or innocence of the defendant, or if the jury, from the evidence, have a reasonable doubt as to any one point necessary to

establish the crime as charge in the indictment, then they ought to acquit the defendant.

In the former opinion of this court, it is stated, plainly, "that the legality of the defendant's arrest was a material question in determining the character of the homicide."

That the breach of the promise to leave the city was no legal ground for his arrest.

It was, therefore, important to the State to prove that Hibler was a watchman, one of the police, and that Roberts was guilty of some violation of the city ordinances, or that he came within the description of the persons who might legally be arrested by the police.

To this it was proper to give evidence tending to show that he was at the time of the attempted arrest a vagrant, as declared by the ordinances of the city. It was also necessary to prove Hibler to be a police officer. But cannot be imagined, for these reasons, that it was necessary to aver in the indictment, that Hibler was a police officer, or that Roberts was a vagrant.

It is not similar to an indictment against a person for resisting an officer in the discharge of his duty. It is the character of the person resisting that partly infuses itself into the act of resistance and deepens its criminality. There, it is not the man, merely, but the officer, in his character as such, which the law has given to him, the resistance to whom is the offence. This official character must be averred—it makes a part or it is rather one of the ingredients of the offence.

It is not so in this case. The deliberate, wilful, premeditated killing of Ephraim Hibler, had he not been an officer, would have been just as great a crime as if he had been the chief officer of the city.

It was also proper to prove that the arrest was ordered, not by reason of the breach of the promise "to leave the city," but because the defendant was one of those characters contemplated by the framers of the city ordinances, and provided against therein. To prove then that he was an able bodied person, idling about the streets, frequenting tippling houses, bawdy houses and without any visible means of support, in short, to prove him to be such a character as the ordinance declares a vagrant, was proper.

There is nothing, therefore, in the acts of the court below, in relation to these points, that we find fault with.

The admission of the dying declarations of Hibler, after the foundation laid for them, as in this case, was proper and right.

We again repeat, that we do not consider a warrant necessary, in every case, before a policeman can arrest. Under the various ordi-

nances of the city, arrests may be made without a warrant, in particular situations, or under peculiar circumstances. Vagrants, night walkers, and other suspicious characters, under the regulations of the city, may lawfully be arrested without a warrant.

To drive a policeman to the necessity of applying for and obtaining a warrant, in order to make an arrest in every case legal, would be to take away the safe guard of property and life in our city, and expose the sleeping inhabitants, with all their property, to the burglar, the incendiary and the cutthroat.

There are many points, noted in the briefs of the counsel of the defendant, which were very ingeneously and ably argued, and I take pleasure in expressing my gratification at such professional ability as was displayed by the counsel for the State and for the defendant in this court. I shall briefly notice several of these points and pass on to the main question of this case, which is, I consider, the rejection of the co-defendant, Jones, as a witness, and is marked as the 3d point in the brief of the defendant's counsel.

The points about the giving and refusing instructions, and the motion for a new trial, on the ground of newly discovered evidence, and the motion in arrest, are passed over with the remark, that I have carefully examined them, and each of them, and feel unwilling to disturb the judgment of the court below thereon.

The instructions given in the case, in my opinion, placed the law of the case plainly before the jury. The instructions refused were properly refused. We adhere to the former opinion, about the right to arrest at common law, and refer to it and the authorities therein cited. All the objections in relation to jurors and the want of examination of the prisoners before indictment, have been overruled; they have no intrinsic force in them.

I now come to the question about the competency of the co-defendant to testify. This question, as it now stands, merits our consideration. The case of Garret vs. the State in 6. Mo. Rep. page 1, is the only case in which the point was expressly decided by this court. In that, the opinion was written by Judge Tompkins, and bears upon its face hesitancy and doubt. "An accomplice *as it seems*, is a competent witness (2 Starkie 22) and may be examined if he be willing, &c," says the judge; that is, it has the appearance in law that the accomplice may be a witness. This opinion was afterwards somewhat reviewed by Judge Napton, in the case of McMillen vs. the State, 13 Mo. Rep., and its force, as authority, much weakened. Indeed, the point is now in doubt, which way the authority prevails. As the law now stands, thus

doubtful, it will be necessary for us to turn our attention to this point, that hereafter the practice in our courts may be uniform.

In all probability, had the remarks of Judge Napton not been made in the case of McMillen vs. the State, we should never have been called on to settle this question. It is generally of the utmost importance to have uniformity in the decisions of the courts of last resort. Whenever, then, a doubtful point has been ruled one way, it is better for its ruling to be looked to as the law, than to have it turned over and thrown in doubt. Decisions, in which principles have been misapplied or overthrown, should be corrected, and the sooner the better. This doubtless was the reason why Judge Napton touched the subject in McMillen's case.

In 2 Virginia cases page 317, the general court held, that it is a well settled rule of evidence, that a party, in the same suit or indictment, cannot be a witness for his co-defendant, until he has been first acquitted, or, in some cases convicted, whether the defendants be jointly or severally tried: 1 Hall 303, 306. This rule is evidence, as well by the earlier decisions of the English courts as by a more recent determination of Lord Ellenborough, in the case of Rex vs. Lafone and others, 5 Esp. 155; and in the case of the People vs. Bill, 10 Johnson's Rep. 95.

In the case of the Commonwealth vs. Lewis Marsh and Henry Barton, 10 Pickering 57. These men were jointly indicted for forgery; the trial of one of them was continued; therefore he was called as a witness for his co-defendant and was by the court excluded as incompetent. Judge Wilde said, "it is an inflexible rule of evidence, that parties of record, whether in civil or criminal prosecutions are not admissible as witnesses. They are not suffered to testify in their own favor, nor are they compellable to furnish evidence against themselves. This rule is not founded exclusively on the ground of interest but of public policy. The same rule is adopted in criminal prosecutions, even if the defendants are tried separately."

In 2 Camp. 334, in note, Le Blanc, justice, said, "the general rule was, that no person, who was a party to the record, was admissible as a witness."

In Rex vs. Locker, Wainwright and wife, 5 Esp. Rep. 107: In an indictment for a conspiracy, the wife of one dependant cannot be a witness for the other. Lord Ellenborough said, upon the proposition to introduce Mrs. Locker (Locker having gone through with his case) as a witness for the other defendants, Wainwright and wife, "he was clearly of the opinion, that she was inadmissible. A joint crime was suspected, in which the husband was implicated: and who would be bene-

fitted by it? It was a clear rule of the laws of England, that a wife could not be called as an evidence for or against her husband, except in the excepted case of Lord Andley; and whether her evidence was mediately or immediately to affect him, the legal objection was equally applicable."

In the case of the State vs. Smith, 2 Iredell 405, Gaston, Judge, said: "It has been insisted in argument, that where a separate trial is had, the prisoner may have witnesses who cannot be admitted if he be tried jointly—for example, his co-defendants or their wives. But this is a mistake, whether the trials be separate or not, one of several defendants indicted together, can not until he is finally discharged, be a witness for the others—and whenever the wife of one is not permitted to testify for the others on a joint trial, she will not be received for them, although her husband be not then on trial."

In Rex vs. Lafone, Hopburn, Davis, Belleter and another, 5 Esp. Rep. 154, Lord Ellenborough said: "In case of a joint indictment against several for a joint offence, I have never known this evidence offered, and I think it cannot be admitted. To allow this evidence, would go to every criminal case, for if two were indicted, one by suffering judgment by default, might protect the other. There is a community of guilt; they are all engaged in an unlawful proceeding; the offence is the offence of all, not the act of the individual only."

In the case of the State vs. Carr and others, one of several was not admitted as a witness though no evidence was adduced to criminate him, I Cox N. J. Rep. 1. Where there is no evidence to inculpate a defendant, or where one was made a defendant by mistake, or where one was made a defendant for the express purpose of excluding his testimony, if nothing be proved against him, he may be admitted as a witness. Bull N. P. 285; Siderfin 441; Addison 352; Pennsylvania vs. Leach. The practice in these cases, is, for the court to direct his acquittal, that he may be used as a witness. The People vs. Bill, 10 John's Rep. 95. In this case the court said: "It appears to be a technical rule of evidence, and one well settled, that a party in the same suit or indictment cannot be a witness for his co-defendant, until he has been first acquitted, or, at least, convicted. Whether the defendants be tried jointly or separately does not vary the rule. It is being a party to the record that renders him incompetent, and the practice is, when nothing appears against one of the defendants, for the court to direct his immediate acquittal, that he may be used as a witness." 1 Hale's P. C. 306; Peake's Ev. 100, Note; 6 Term. Rep. 623.

As to the incompetency of the co-defendant, see also, the People vs.

Williams, 19 Wendell 377; State vs. Mills, 2 Dev. 420; Rex vs. Rowland, 5 Ry. and Mov. 401; 21 Eng. Com. L. Rep. 471; 1 Yerger 531; Wharton's Crim. L. 210; State vs. Calvin, 1 R M. Chan. 151 to 169.

In the case of Jones vs. State of Georgia, 1 Kelly 617, a contrary doctrine was held. A person jointly indicted, who severed on the trial, was considered a competent witness for his co-defendant.

The authorities are, in some degree in conflict, but the weight of authority is against the admissibility of such evidence.

Public policy, in my opinion, is likewise against it. Men guilty of one crime are tempted to commit another in order to escape from the impending judgment.

The opinion of Judge Napton very plainly shows his view of this question, and how he would have decided it if necessary, in the case of McMillen vs. The State in 13 Mo.

I come, therefore, to the conclusion, that the court did not err in rejecting the evidence of the accomplice, Jones. The judgment of the criminal court is therefore affirmed, Judge Gamble concurring; and the case is remanded to the court below in accordance with the criminal practice, for that court to proceed in order to have its judgment carried into execution.

Judge Scott dissents on the point of the incompency of the co-defendant only.