WILLIAM ADAMS, PLAINTIFF IN ERROR, VS. THE STATE OF FLORIDA, DEFENDANT IN ERROR.

1. In an indictment for murder it is essentially necessary to set forth particularly the manner of the death and means by which it was effected, but in stating the facts which constitute the offense no technical terms are required, and an averment of the manner and means by which the deceased came to his death in concise and ordinary language, and in such a way as to enable a person of common understanding to know what was intended, is sufficient.

2. It is within the discretion of the trial court to allow a plea of not guilty to be withdrawn for the purpose of pleading in abatement.

| | |
|---|---|
| 28 | 511 |
| 29 | 504 |
| 28 | 511 |
| 30 | 138 |
| 30 | 267 |
| 31 | 169 |
| 31 | 283 |
| 28 | 511 |
| 32 | 317 |
| 28 | 511 |
| 34 | 187 |
| 34 | 325 |
| 28 | 511 |
| 33 | 635 |
| 28 | 511 |
| 35 | 174 |
| 28 | 511 |
| 36 | 379 |
| 28 | 511 |
| 38 | 196 |
| 28 | 511 |
| 40 | 160 |
| 40 | 213 |
| 40 | 269 |
| 28 | 511 |
| f41 | 523 |
| f41 | 572 |
| f41 | 638 |
| 28 | 511 |
| 42 | 207 |
| 42 | 226 |
| 42 | 525 |
| 28 | 511 |
| 44 | 100 |
| e44 | 117 |
| j44 | 124 |
| 46 | 57 |
| 48 | 14 |
| 28 | 511 |
| e50 | 16 |
| 50 | 77 |
| 51 | 87 |
| 28 | 511 |
| 52 | 65 |

512      SUPREME COURT.

3. A plea in abatement alleging that two members of the grand jury that found an indictment against an accused were not legally registered voters, and that the illegality of their registration consists in the fact that they were not registered within the time prescribed by the general election law, but were registered, or their names placed upon the registration books, within the time prescribed by Chapter 3577, laws of Florida, being an act to provide for the election of delegates to the Constitutional Convention held in 1885: *Held*, That the plea is not good, for the reason that persons duly registered under said act were as duly registered voters of the county as those who registered under the general election laws.

4. An application for a change of venue is addressed to the sound discretion of the court, and its ruling, refusing the change, will not be disturbed unless it appear from the facts presented that the court acted unfairly and abused a sound discretion.

5. The refusal of the court to grant a change of venue, where the application is based upon the grounds that a fair and impartial trial cannot be had in a county, and that the accused is odious to the inhabitants thereof, and supported by the uncorroborated affidavit of the accused. although the facts therein stated, if true, are sufficient to require the change, will not be reversed on writ of error, in the absence of anything to show that the decision of the court was not based upon the insufficiency of the proof of the facts alleged in the affidavit, and that the accused was not prevented from getting corroborative evidence by hostile public sentiment.

6. A party has no right to cross-examine a witness, except as to facts and circumstances connected with the matters stated in his direct examination, and if he wishes to examine the witness as to other matters he must do so by making the witness his own.

7. An accomplice, jointly indicted and as to whom the indictment

has not been disposed of, can testify on behalf of the State against his co-defendant on a separate trial; and in such case the wife of the accomplice is a competent witness for the State.

8. A map, diagram or picture, whether made by the hand of man or by photography, verified as a correct representation of physical objects about which testimony is offered, and which do not contain thereon indications of matters and things in question before the jury, and not a part of the physical objects when the map, diagram or picture was made, are admissible in evidence for the use of witnesses in explaining their evidence, and to enable the jury to better understand the case.

9. Under the defense of an *alibi* it is sufficient if there is enough evidence to produce in the minds of the jury a reasonable doubt as to the presence of the prisoner at the scene of the killing. The evidence of an *alibi* need not make it impossible for the prisoner to be present at the killing, nor is it required that such evidence be absolutely clear, but it is sufficient if it raises a reasonable doubt in the mind of the jury, from all the circumstances of the case, whether or not the accused was present at the killing.

10. It is the province of the court to pass upon the admissibility of the evidence, but when admitted, its credibility and weight are questions for the jury. The trial judge, under our system, is prohibited from intimating to the jury his views as to the effect, weight or credibility of any testimony before him.

11. A charge to the jury that " when proof of an *alibi* is attempted, and proven to the satisfaction of the jury, it is conclusive of the case, when it is attempted, and the proof to sustain it is not satisfactory, the failure to prove it satisfactorily is a circumstance unfavorable to the defendant, but it is no more so than an attempt to clear himself by any other false or fabricated testimony: *Held,* To be erroneous.

33

12. It is not proper for a trial judge to state in his charge to the jury the facts of a case decided by our Supreme Court, and then submit to them the question, whether or not that case and the one under consideration are parallel. Such a course would not be giving the law of the case, but would leave the jury to form notions of the law by a comparison of the two cases.

13. Under an indictment for murder in the first degree, the question of premeditation is one of fact, to be ascertained by the jury from the facts and circumstances of the case. The law does not presume malice or premeditation from the fact of killing, but such state of mind is to be ascertained by the jury from the circumstances surrounding the killing.

14. In a capital case the prisoner must be present during the trial, and no steps can be taken by the court in his absence.

Writ of Error to the Circuit Court for Columbia county.

The facts of the case are stated in the opinion of the court.

*B. B. Blackwell* and *A. J. Henry* for Plaintiff in Error.

No appearance for the State.

MABRY, J.:

William Adams, the plaintiff in Error, Ike Spanish and T. P. Bethea, were jointly indicted on the 26th day of February, A. D. 1891, at a term of the Circuit Court for Columbia county, Florida, for the murder of James Moore. Adams was indicted as principal in the

first degree, Spanish as principal in the second degree, and Bethea as accessory before the fact.

It is charged in the indictment (the formal parts omitted) " that William Adams, Ike Spanish and T. P. Bethea, late of said county, laborers, on the 19th day of January, A. D. 1891, at and in the county, circuit and State aforesaid, with force and arms, did then and there, unlawfully, feloniously and of their malice aforethought, and from a premeditated design to effect the death of a human being, make an assault upon one James Moore. And the said William Adams, with a certain double-barrel shot-gun, then and there loaded with gunpowder and leaden balls, commonly called buckshot, and by him, the said William Adams, then and there had and held in his two hands, did then and there unlawfully, feloniously and of his malice aforethought, and from a premeditated design to effect the death of him, the said James Moore, shoot off and discharge at, to, against and upon the body of him, the said James Moore, thereby, and by thus striking the body of him, the said James Moore, with the said leaden bullets, commonly called buckshot, so shot off and discharged out of the double barrel shot-gun aforesaid, unlawfully, feloniously and of his malice aforethought, and from a premeditated design to effect the death of him, the said James Moore, inflicted then and there in and upon the chest and belly of him, the said James Moore, three mortal wounds, each of the depth of six inches, and of the breadth of one-quarter of an inch, of which

said mortal wounds the said James Moore then and there instantly died.

"And the jurors aforesaid, upon their oaths aforesaid, do further say that the said Ike Spanish then and there unlawfully and feloniously, and of his malice aforethought, and from a premeditated design to effect the death of the said James Moore, was then and there present, aiding, abetting, helping, comforting, assisting and maintaining the said William Adams, the murder of him, the said James Moore, in manner and form aforesaid, to do and commit.

"And the jurors aforesaid, upon their oaths aforesaid, do further say that the said T. P. Bethea did then and there unlawfully, feloniously, and of his malice aforethought, and from a premeditated design to effect the death of him, the said James Moore, incite, move, aid, counsel, hire, abet, assist, procure and command the said William Adams, the murder of him, the said James Moore as aforesaid, in manner and form aforesaid to do and commit.

"And so the jurors aforesaid, upon their oaths aforesaid, do say that the said William Adams, Ike Spanish and T. P. Bethea, the said James Moore, then and there in manner aforesaid, and by the means aforesaid, unlawfully, feloniously and of their malice aforethought, and from a premeditated design to effect the death of him, the said James Moore, him, the said James Moore, then and there did kill and murder, against the peace and dignity of the State of Florida,

and contrary to the form of the statute in such cases made and provided."

Adams and Spanish were in custody when the indictmet was presented in court, and so far as the record shows, Bethea has not been arrested.

On motion of the State a severance was granted and William Adams, the plaintiff in error, after arraignment and plea, was tried and convicted of murder in the first degree. Motions in arrest of judgment and for a new trial were overruled, and by judgment of the court the sentence of death was passed upon this accused. From this judgment a writ of error was taken to this court.

The first and second assignments of error call in question the sufficiency of the indictment, are in substance the same and will be considered together. Before arraignment and plea the plaintiff in error moved to quash the indictment, 1st. "Because it alleges a premeditated design to effect the death of a human being without naming the deceased as the person whose death was intended to be effected through the premeditated design alleged;" 2nd. "Because said indictment is argumentative and states a conclusion and does not allege in positive terms that the deceased was struck and penetrated by the means alleged to have caused his death;" 3rd. "Because said indictment is vague, indefinite and uncertain and calculated to embarrass the defendant in his defense." The overruling of this motion is the first error assigned. After verdict a motion in arrest of judgment alleging substantially the

same defects in the indictment was denied, and this is presented as the second error.   We do not think the court committed any error in overruling the motions to quash the indictment and in arrest of judgment. As will be seen by reading the indictment, the principal allegations of which are given above, three persons are jointly indicted; one as committing the felonious act, a second as present, aiding and abetting, and a third as inciting, counseling, hiring and procuring the commission of said act.   It is true, as contended, that the indictment states that the three persons named did, with the intent and in the manner alleged, with the design to effect the death of a human being, make an assault upon one James Moore, but taking the indictment together, we think it is clear that the person whose death was designed to be effected was James Moore.   If the words " to effect the death of a human being" be discarded as surplusage, the averment would be positive and direct that the accused with force and arms did then and there unlawfully, feloniously and of their malice aforethought, and from a premeditated design, make an assault upon one James Moore.   Another objection urged in this indictment is, that it is argumentative, and does not allege in positive terms that the deceased was struck and penetrated by means alleged to have caused his death.

It is essentially necessary in an indictment for murder to set forth particularly the manner of the death and the means by which it was effected.   The facts which constitute the offense must be stated with such

certainty and precision that the defendant may be enabled to judge whether they constitute an offense or not, and also the character or species of offense they do constitute, to enable him to prepare his defense, to plead a conviction or acquittal in bar of another prosecution for the same offense, and that there may be no doubt as to the judgment which may be given in case of conviction. In alleging offenses created by statute, the language of the statute, of course, must be employed. In stating the facts and circumstances which constitute the offense no technical terms are required to be employed, but an averment of the means and manner by which the deceased came to his death, in concise and ordinary language, and in such manner as to enable a person of common understanding to know what is intended, is sufficient. In the case of Pittman vs. State, 25 Fla., 648, the indictment charged that the defendant, "in and upon one George H. Hughes, with a certain deadly weapon, to-wit: An open knife, which he, the said Edward F. Pittman, was then and there armed, feloniously, wilfully and of his malice aforethought, did make an assault, and the said George H. Hughes in and upon the right side of the neck of him, the said George H. Hughes, then and there with the knife aforesaid, and by cutting, stabbing and wounding, feloniously, wilfully and of his malice aforethougt to kill and murder," and it was held that while the indictment was not artistically drawn, there was in it enough to show that Pittman was the party doing the cutting, and that Hughes was the party cut, and that

the indictment shows by whom the assault was made, how it was made and upon whom it was made. The averments in the indictment before us are not as direct and positive as they could be made, still we think they are sufficient to show that the plaintiff in error did unlawfully, feloneously and with a premeditated design to effect the death of James Moore, shoot off and discharge at, to, against and upon the body of the said James Moore, a certain double-barrel shotgun held by the accused, and loaded with gunpowder and leaden balls, and by striking the body of the said James Moore with said leaden balls, so shot out of the gun aforesaid, inflicted three mortal wounds upon the body of the said James Moore, at the place mentioned, and in the manner alleged in the indictment, and of which said mortal wounds the said James Moore did then and there instantly die. The allegations here are sufficient to inform the accused of the nature of the offense intended to be charged, and the manner of its commission. In the event of conviction or acquittal, the accused would find no difficulty in pleading successfully the judgment in bar of a second prosecution.

The action of the court in overruling the motion of defendant, Adams, to withdraw his plea of not guilty, and plead in abatement, is assigned as error. The indictment was presented in court on the 26th day of February, A. D. 1891, during a regular term of court, but the trial was not had until a special term of the

court beginning on the 23rd day of March, A. D. 1891. Before the adjournment of the regular term the State attorney moved for the arraignment of the defendant, Adams, to which he objected, for the reason that as the case had to go over until the special term, he desired until that time to examine the record and ascertain as to the legality of the organization of the grand jury that found the indictment; his counsel also stating that they were not then prepared to plead to the indictment. The court ruled that the defendant should then be arraigned, which was done, and he pleaded not guilty. At the special term the defendant, Adams, moved the court to allow him to withdraw his plea of not guilty, and to be allowed to interpose a plea in abatement of the indictment, at the same time presenting his plea, properly sworn to before the Clerk of the Circuit Court of Columbia county. The court refused this motion. The action of the court requiring defendant, Adams, to plead at the regular term, and the refusal to allow him to withdraw his plea of not guilty, and plead in abatement at the special term, are both assigned as error.

It is within the discretion of the Circuit Court to allow a plea of not guilty to be withdrawn for the purpose of pleading in abatement. This court has recognized this right in the case of Savage and James vs. State, 18 Fla., 909, and it is unnecessary for us to cite the numerous authorities sustaining the position. In

the Savage and James case it is said by Chief Justice Randall : "It may have been within the discretion of the court to permit the accused to withdraw the plea of not guilty, for the purpose of pleading abatement, but such discretion should never be reviewed or set aside." It would seem from this language that the exercise of the discretion of the court in such matters is not subject to review. It does appear, however, that the court in the same case looked into the merits of the plea in abatement tendered, and held that the court did not err in refusing the motion to withdraw the plea in bar, and for leave to plead in abatement. Without stopping to settle the question whether or not the decision in the Savage and James case precludes a review of the discretionary powers of the Circuit Court in such matters, we proceed to enquire into the merits of the plea in abatement tendered. It follows, of course, that if the plea is not good, no harm has been done the plaintiff in error in forcing him to plead before an opportunity was given him to look into the validity of the indictment. The plea sets up the fact that two members of the grand jury that found the indictment were not legally registered voters of Columbia county, and the illegality of their registration is alleged to exist in the fact that the registration books of Columbia county show the parties to have been registered, or their names placed on the registration books on the 14th and 23rd days of April, A. D. 1885. It is con-

tended by the plaintiff in error that the two jurors named in the plea did not register within the time prescribed by the general election law, but they did register within the time prescribed by the special act of the Legislature, Chapter 3577, laws of Florida, providing for the calling of a constitutional convention. The second section of this act provides that "there shall be held throughout the State under the provisions of the election laws of the State, on the first Tuesday in May, a general election for delegates to said convention, which shall consist of one hundred and eight members, apportioned among the several counties and senatorial districts, in accordance with the present representation in the Legislature. That the registration books of the several counties be opened in the various precincts for the registration of voters not now legally registered, from the first Monday in April, 1885, to ten days next preceding the election, and that the Clerk of the Circuit Court appoint registration officers for such precincts." The effect of this act was to open the general registration books within the time mentioned for the registration of all voters legally entitled to registration and not already registered, and when persons were registered and their names placed upon the general registration books under and by virtue of this act they were as much legally registered voters as any others whose names appeared upon the books. The Legislature had the power to direct the opening of the

books for general registration at any time, and it was the purpose of the act of 1885 to open the general registration books from the first Monday in April, 1885, to ten days preceding the first Tuesday in May, 1885. The fact that the registration permitted at that time was for the purpose of voting for delegates to the constitutional convention, makes no difference. The election for such delegates was held under the provisions of the general election laws, and the registration books used for this election were the same used for all general elections. There was nothing in the plea to show that the jurors named were not legally registered voters of Columbia county, and conceding that we have the power to review the action of the court in refusing to allow the plea to be interposed, it follows that the court did not err in so doing. There is nothing in the case of State *ex rel.* Martin v. County Commissioners of Sumter county, 20 Fla., 859, in conflict with the conclusions here reached.

The refusal of the court to grant a change of venue to the defendant, Adams, is assigned as error.

The accused, Adams, before the beginning of the trial at the special term, made a motion for a change of venue on the grounds that a fair and impartial trial could not be had in Columbia county by reason of extreme prejudice of the inhabitants of that county against him, and because he was odious to such inhabitants. In support of this motion the accused presented to the court his own affidavit, uncorroborated by the affidavit or sworn testimony of any other

person. In his affidavit the accused stated that the murder for which he was indicted was an assassination, the deceased having been shot down in his own house in the presence of his family; that several days after the killing one Ike Spanish was arrested on suspicion, and under threats of his life if he did not confess and implicate others, and also under promises of protection if he would divulge, he confessed to a participation in said murder, and implicated accused, as principal in the crime, and one T. P. Bethea, as accessory before the fact; that thereupon the accused, Adams, was arrested on said charge, and bound and held in chains, and a large and excited crowd of people with rifles, shot-guns, pistols and other weapons assembled around him and threatened to lynch him ; that accused verily believed from the demonstrations of violence on the part of said people that he was in iminent danger of being lynched, and that he would have been lynched with said Spanish but for the fact that the other person implicated had not been arrested. Further, that in February, 1889, one Keene was assassinated in Columbia county by some unknown person, in a manner similar to the way in which the person was killed for which he now stands indicted, and that he was suspicioned of the murder of said Keene, but which was without foundation, except said accused at the time of Keene's death was in a controversy with him; that at the fall term, 1889, of the Circuit Court for Columbia county, said accused was indicted for the murder of Keene, and at the said•

term of the court eight other indictments were presented by the grand jury of said county against him, one of which was for personal violence on said Keene in his lifetime; that of the said nine indictments against him, four were tried and verdicts of acquittal rendered, and the others were dismissed on the part of the State; that while said accused was entirely inno-cent of either of the crimes charged against him, nevertheless the finding of said indictments all at one term of court, and the arrest and arraignment of said accused thereon, had the effect to greatly prejudice the public mind against him throughout the county, and render him extremely odious. The accused further states in his affidavit that the confession of the said Ike Spanish implicating him, was published in two newspapers in Columbia county, and this had the effect to further prejudice, excite and irritate the public mind against him. Copies of the papers giving an account of the confession made by Ike Spanish and the arrest of the accused, Adams, are attached to the affidavit as a part of it. The publications in the newspapers give an account of the killing of James Moore, the public indignation manifested over it in the neighborhood where it occurred, and a determined purpose on the part of the people by diligent search and investigation to find out the perpetrators of such a crime. From the newspaper accounts it appears that there was much excitement in the neighborhood of the deceased, and for miles around, over his death. In the accounts published there is no advice given

to deny the parties implicated a fair and impartial trial in the courts of the country. One of the papers particularly cautions the people to act deliberately, and to give the accused a right to be heard, and a fair and impartial trial. The accused further states in his affidavit that by reason of the newspaper publications and the other matters stated in his affidavit, the public mind was inflamed against him and that by reason thereof, at the request of the Governor of the State he was transferred from Columbia county to Duval county in this State to prevent his being lynched; that at the last term of the court, which was about three weeks prior to the presentation of the application for a change of venue, when the accused asked for a continuance of the prosecution against him, there was many rumors afloat that if said continuance was granted, accused would be lynched, and but for the fact that a special term of the court was ordered to convene in a short time for the trial of the accused, he is satisfied that said threats would have been put in execution; that since the assembling of the court it has been made known to the counsel for said accused that there is an organization now in force for the purpose of lynching him in the event of his acquittal or conviction, claiming as a justification for their unlawful purpose that if the accused be acquitted it will be a wrongful acquittal, and if he is convicted, instant execution should take place in order to prevent an appeal to a higher court; that by reason of such matters the public mind is greatly

prejudiced against the accused, and it will be impossible to secure a jury in said county to try him uninfluenced thereby.

The State made no counter showing, and on the motion and affidavit of the accused the court refused to change the venue. We have duly considered this application of the accused for a change of venue, and have reached the conclusion, on the showing made, the verity of the facts stated appearing only by the uncorroborated affidavit of the accused, that we cannot disturb the action of the court. It is true that the constitution guarantees to every person under a criminal prosecution a trial by an impartial jury, and by statute it is provided that when it shall appear to the satisfaction of the trial court by affidavit that a fair and impartial trial cannot be had in the county where the offense is committed, the court shall direct that the accused be tried in some other county where a fair and impartial trial can be had. It is said in the decisions that the principles which should guide the trial court in such matters are simple. If it be shown to the reasonable satisfaction of the court that an impartial trial and an unbiased verdict cannot be reasonably expected the venue ought to be changed. Posey vs. State, 73 Ala., 490. To grant an accused less than this would deprive him of a right given, under our system, both by the constitution and statute. As has been expressed in the case of Seames vs. State, 84 Ala., 410 : "These provisions have in view, not only the object of securing a just verdict, but a just

mode of procedure in obtaining it." In Florida, however, such matters are, to a large extent, committed to the trial court, not absolutely so, because its decision is subject to review here. An application for a change of venue is addressed to the sound discretion of the court, and its ruling refusing the change will not be disturbed unless it appear from the facts presented that the court acted unfairly and was guilty of a palpable abuse of sound discretion. McNealy and Roulhac vs. State, 17 Fla., 198; Irvin vs. State, 19 Fla., 872. Before us there is nothing to overrule the action of the court in refusing the change, except the uncorroberated affidavit of the accused. If we consider the extracts from the newspapers in connection with the affidavit, they do not show, independent of what the accused swears, that the public prejudice against him is such that he cannot obtain a fair trial in the county. Neither do we think that because there was applause in the court room during the argument of the State Attorney, it is shown that a fair and impartial jury had not been obtained in the county. The application here for a change of venue, based as it is on the ground that the public mind was so prejudiced against the accused, and that he was so odious, that a fair and impartial trial could not be had in Columbia county, if sustained, must be upon the unsupported affidavit of the accused. We think it would be unsafe to announce such a rule on such a showing. Counsel for

plaintiff in error have referred us to no case, and we have been unable to find anywhere that the discretionary action of the trial court has been set aside on such showing. In the affidavit before us it is shown that the accused has been in custody, and most of the time out of the county, since he was suspected, and hence his means of knowing the public sentiment in the county must be by information derived from others. Nor does it appear that he has made any effort to get corroberative evidence of his statement, and had been prevented from getting it by reason of hostile public sentiment. We do not intimate that what he has stated if true is not sufficient to entitle him to a change of venue, but we do say that in a case like this we are unwilling to disturb the decision of the trial court, which may have been based upon the insufficiency of the proof of the facts alleged, without further showing than the uncorroberated affidavit of the accused. To hold otherwise would permit every accused to obtain a change of venue at his pleasure, or force the trial judge on such *ex parte* showing, however groundless the application may appear to him, to suspend the regular business of the court and enquire into the public sentiment in the county in reference to the accused.

It is alleged for error that the court sustained the State's objection to the question propounded to Mrs. Moore, the wife of the deceased.

The ruling of the court was based upon the ground that the question was not in cross-examination of anything brought out by the State on the examination in chief. The rule stated by Greenleaf, that a party has no right to cross-examine any witness, except as to facts and circumstances connected with the matters stated in his direct examination, and if he wishes to examine him as to other matters, he must do so by making the witness his own, is recognized in this State. 1 Greenleaf on Evidence, sec. 445; Savage and James vs. State, 18 Fla., 909. In the examination in chief of Mrs. Moore, she was asked about the killing of her husband, but stated nothing in reference to the defendant. She knew that her husband was shot down in his house just after dark, but she did not see the person who shot him. There is nothing in her examination which, under the rule, entitled the defendant to examine her on the cross as to the relations between her husband and the defendant, and the court did not err in sustaining the objection. In this connection we will consider the assignment of error based upon the ruling of the court sustaining the objection of the State Attorney to the question asked the witness, Andrew Spanish, who was introduced as a witness for the State, and testified that in the evening of the night the deceased was killed he was in the field with his father, mother and sister, and that the accused, Adams, came in the lane and called him and his father; that they

went to the accused in the lane and the witness gave him a gun, and that the accused and witness' father went towards the river. On cross-examination the witness was asked if he knew where his father went that evening, and the court excluded the question on the ground that it was not in cross of anything brought out in chief. This ruling was not correct. The father had testified that he and the accused went to Moore's house that evening, and just after dark the acused shot Moore. Andrew Spanish was put on the stand to corrob erate the father in his testimony. He says that he saw his father and the accused together in the lane, and saw them go towards the river. It was proper on the cross to prove by this witness, if he knew, where his father went that evening, and the enquiry as to his knowledge of this matter was preliminary to such examination. Savage and James vs. State, *supra.*

Another ground of error is, that the court erred in permitting the witness, Hanks, to testify as to statements made to him by the accused.

It appears from the record that the witness, Hanks, was present when the accused was arrested, and heard him say where he was at the time Moore was shot. Hanks was not an officer, and no threats were made against the accused, or promises held out to him at the time of his statement. The court ruled that the statements of the accused as to his whereabouts at the time of the homicide could be proved by the State. In

this we think the court was correct. Newton vs. State, 21 Fla., 53.

It is assigned for error and contended here that the court erred in allowing Ike Spanish, an accomplice, and jointly indicted with the accused, Adams, to testify against him.

As has already been stated, Adams and Spanish were jointly indicted, the one as principal in the first degree, and the other as principal in the second degree, for the murder of James Moore. After a severance, procured at the instance of the State, Spanish was tendered as a witness on the part of the prosecution against Adams, and was permitted to testify over his objection. We do not understand that the objection goes to the extent that no accomplice can testify under any circumstances against his associate in crime, but that an accomplice jointly indicted, and as to whom the indictment has not been disposed of, cannot testify as a witness against his co-defendant, whether the trial be joint or seperate. It has been announced in several cases decided by this court that an acomplice is a competent witness against an accused on trial. Sumpter vs. State, 11 Fla., 247; Keech vs. State, 15 Fla., 591; Bacon vs. State, 22 Fla., 51; Tuberson vs. State, 26 Fla., 472, 7 South. Rep., 858. In Tuberson vs. State, *supra*, although it is said that an accomplice is a competent witness, and a conviction upon his testimony may be sustained, yet there was no such evidence in the case. In Sumpter vs. State, *supra*, the

accomplice who testified was not under indictment; and in Bacon vs. State, *supra*, although the accomplices who testified were jointly indicted, no objection was made by the defendants on trial to such testimony. In Keech vs. State, *supra*, the accomplice who testified for the State was jointly indicted with the party against whom the evidence was given, and it appears from the record that the defendant objected to the accomplice testifying. It is contended that at common law a party to the record was incompetent as a witness for himself, or for or against a co-defendant, and that in criminal cases such disability has not been removed in this State by statute. At common law when two persons were jointly indicted neither was admissible as a witness for his co-defendant, and this rule obtained whether they were tried jointly or separately. If during the trial no testimony should be developed against a defendant, and the State refuses to dismiss as to him, the court has the power, and it would be its duty, to submit his case first to the jury, and after acquittal he can testify for the other defendant. State vs. Roberts, 15 Mo., 28; Shay vs. Commonwealth, 36 Penn. St., 305; State vs. Jones, 51 Maine, 125; Moss vs. State, 17 Ark., 327; People vs. McIntyre, 1 Parker's Cr. Rep., 371; State vs. Bruner, 65 N. C., 499; Rex. vs. Rowland, Ryan & Moody (21 Eng. Com. Law), 401; Commonwealth vs. Marsh, 10 Pick., 57; People vs. Bill, 10 Johnson, 95; Foster vs. State, 45 Ark., 328; 1

Bishop's Crim. Pro., secs. 1020, 1021. As parties jointly indicted in the same record cannot be called as witnesses to testify for each other, whether tried jointly or separately, it is contended that an accomplice jointly indicted with another cannot be used by the State as a witness against his co-defendant until the case has been disposed of as to the accomplice who proposes to testify. The case of Edgerton vs. Commonwealth, 7 Bush., 143, sustains fully this position. The decision in the case of State vs. Chyo. Chiagk., 92 Mo., 395, cited by counsel for plaintiff in error, is based upon a statute. Section 1079, 1 Bishop's Crim. Pro., at first glance, seems to sustain this view. It is here stated that "if two persons are jointly indicted, neither of the defendants can be a defendant for or against the other, even though not tried together, until the case is disposed of, either by the conviction or acquittal of the defendant whose testimony is to be used, or by the entry of *nol. pros.* as to such defendant. One method of procedure, therefore, when there is pending such a joint indictment, and one of the defendants is to be admitted as State's evidence against the other, is to let such defendant plead guilty, then, before sentence, he is a competent witness." This author is stating one method of procedure in obtaining the testimony of accomplices, but he does not say this is the only method. In considering this question it is important to distinguish between the weight or effect of such evidence,

and the admissibility of it, and also the difference between the right of either the State or the defense to compel a party to testify and disclose what he knows not criminative of himself, and the testimony of a party who criminates himself and also furnishes evidence for the purpose of bringing others to justice. The true view of the matter, we think, is, that the right of the State to examine a party who volunteers testimony not only against himself, but others, is founded upon an exception to the common law rule excluding parties to the record. Mr. Greenleaf, in sec. 379, says that "the admission of accomplices, as witnesses for the government, is justified by the necessity of the case, it being often impossible to bring the principal offenders to justice without them. The usual course is to leave out of the indictment those who are to be called as witnesses; but it makes no difference as to the admissibility of an accomplice whether he is indicted or not, if he has not been put on his trial at the same time with his companions in crime." It is stated in 2 Hawkins' Pleas of the Crown, page 603, sec. 91 : "It hath been often ruled that accomplices who are ndicted are good witnesses for the king until they be convicted." *Vide* also 1 Roscoe's Crim. Ev., page 198; Wharton's Crim. Ev., sec. 439; Wixon vs. People, 5 Parker's Cr. Rep., 119; Carroll vs. State, 5 Nebraska, 31; Best's Principles of Ev., sec. 170. The rule stated by Mr. Greenleaf in the section mentioned above, we

think, is the correct one at common law, and that the witness, Ike Spanish, is competent to testify against the accused, his testimony to be weighed as that of an accomplice. It was held in the case of Keech vs. State, *supra*, that a principal in crime before conviction of felony was a competent witness against his associate on a separate trial. We think that conclusion was correct, according to the principles of the common law. The right of the accomplice to testify at common law was not absolute, but rested within the discretion of the court to admit him or not, as was deemed proper. Rex. vs. Rudd, 1 Cowper, 331; Charge of Abbott, C. J. Trial of Thistlewood, 33 State Trials (1817-1820), 683-690; People vs. Whipple, 9 Cowen, 707. Judge Randall says in the Keech case that "the act of March 15th, 1843, (Thompson's Digest, 335), provides that 'no person shall be deemed an incompetent witness by reason of having committed any crime unless he has been convicted thereof in this State,' and it follows that it is not within the jurisdiction of the court in this State to admit or reject the witness, for he is by express statute a competent witness." If the statute mentioned has made an accomplice jointly indicted a competent witness before conviction, then it would seem that all defendants are competent witnesses before conviction—a result we do not concede without further consideration. We follow the decision in the Keech case because we think it correct according to common law practice.

It is also contended that Charity Spanish, wife of Ike Spanish, is an incompetent witness.

The ground urged for her exclusion is that she is the wife of Ike Spanish, the person jointly indicted with the defendant, Adams. We have just seen that Ike is a competent witness. If he is competent, she is also competent, and there was no error in permitting her to testify. Wixon vs. People, 5 Parker's Cr. Rep., 119; Wharton's Cr. Ev., sec. 391.

Another assignment of error 'is, that the court permitted the map made by one, Brown, to be exhibited to the jury and put in evidence on the part of the State.

A map, plan or picture, whether made by the hand of man or photography, if verified as a true representation of the subject about which testimony is offered, is admissible in evidence to assist the jury in understanding the case. They are frequently formally admitted in evidence, and in so far as they are shown to be correct, are proper for the consideration of the jury, not as independent testimony, but in connection with other evidence, to enable the jury to understand and apply such evidence. In State vs. Lawlor, 28 Minn., 216, diagrams of the premises where a homicide was committed, made from actual measurements, and verified by the party who made them as correct, except that the position of certain chairs, tables, and movable objects in the house on the night of the homicide, was indicated thereon upon

information given him by the keeper of the house,
were used on the trial.   These diagrams were not for-
mally offered in evidence, but the witnesses in giv-
ing their evidence were allowed to refer to them to ex-
plain their testimony :   *Held*; that there was no error
in this.   Maps or diagrams, shown to be correct repre-
sentations of physical objects about which testimony
is given, can be exhibited before the jury, and wit-
nesses will be permitted to use them in explaining
their evidence.   Blair vs. Pelham, 118 Mass., 420;
Shook vs. Pate, 50 Ala., Vilas vs. Reynolds, 6 Wis.,
214; Moon vs. State, 68 Ga., 687; Underzook vs. Com-
monwealth, 76 Penn. St. 340; Ruloff vs. People, 45 N.
Y., 213; Knight vs. State, 43 Maine, 11, 130.   In sec.
545 of Wharton's Crim. Ev., it is stated that authen-
ticated plans or diagrams of the *locus in quo* are ad-
missible.   But such a plan ought not to contain any
references to matters before the jury when such mat-
ters were not existing when the survey was made.
The map introduced in evidence in the case before
us was made by John V. Brown.   He testified that
he was familiar with the country and locations indi-
cated on the map, and that the measurements were
correct.   So far as the diagram of the country, includ-
ing the roads, houses, fields and fixed objects be-
tween the residences of the deceased and the accused,
we think the map was sufficiently verified to admit
it in evidence.   There are some indications of the map
which we think are improper, and the State should
not have introduced it in evidence with these indica-

tions on it. The witness, Ike Spanish, testified that the accused killed Moore, and that he, Spanish, was present. In his testimony he gave a description of the route traveled by himself and the accused to where Moore was killed. On this map is traced distinctly in large lines a route, and there is written along it "Ike Spanish's route." Another witness, Sandy Sheffield, testified that on the evening that Moore was killed he was splitting rails at a point near where Ike Spanish said he and the accused passed, and that he, witness, saw the accused going that way. There is marked on the map the words "Sandy Sheffield was here," and also a designation on the map of where "Will Adams" was. Ike Spanish did not take the map and trace the route in explanation of his testimony; neither did Sandy Sheffield mark on the map where he was, and where he saw Will Adams passing along, but it appears that Mr. Brown put these indications on the map. It also seems that the map was introduced in evidence after Spanish and Sheffield had testified. We think a map or diagram of the country in its physical condition at the time can be put in evidence, and any witness in giving testimony as to localities can indicate on the map the relative position of things or persons. But for a person who knew nothing of these matters except what he heard from others to designate the movement of persons on the map would be testimony of a secondary character, and improper to be admitted.

On the subject of an *alibi* the judge charged the jury as follows, viz : "If you find from the evidence and are satisfied the defendant was not present when the deceased was killed, you must find him not guilty. To make the defense of an *alibi* available as defense the evidence of its existence must cover the whole time when the presence of the defendant was required; you must determine from the evidence whether the defendant has proven that he was not present when Moore was killed or not; if you have a reasonable doubt in your minds as to whether he was present at the time Moore was killed, you should find him not guilty; *when the defense of an alibi is clearly proven by reliable and truthful evidence, it is of all others the most decisive, because it is impossible for a man to be in two separate places at the same time, the evidence must be such as to render it impossible that the crime could have been committed by the person that claims he was not present, and that he could not be guilty as charged;* the evidence in support of it and against, as well as all the other evidence in the case, demands your most careful and thoughtful consideration." The portion of the charge in italics was excepted to by the accused.

We think the proposition of law stated in the first clause of this charge is proper ; that is, to the effect, that if the jury have a reasonable doubt as to whether the defendant was present at the scene of the homicide, he is entitled to the benefit of such doubt and should be acquitted. But we think that the subse-

quent portion of the charge, from its phraseology, may have a tendency to mislead the jury and to obliterate from their minds the idea that a reasonable doubt, arising out of the evidence as to the *locus* of the prisoner at the time of the killing, must work an acquital. We think that the evidence in support of an *alibi* need not be absolutely clear; it is sufficient if there is enough to produce in the minds of the jury a reasonable doubt as to the presence of the prisoner at the scene of the killing. Neither do we think that the evidence of an *alibi* should in any case make it absolutely impossible for the prisoner to be present at the killing; it is sufficient if it raises a reasonable doubt in the minds of the jury from all the circumstanses, whether he was present or not. 1 Greenleaf on Evidence, sec. 81 b.; State vs. Waterman, 1 Nev., 543; Turner vs. Commonwealth, 86 Penn. St., 54; People vs. Fong Ah Sing, 64 Cal., 253; Landis vs. State, 70 Ga , 651; Pollard vs. State, 53 Miss., 410; Means vs. State, 10 Texas Ct. App., 16; State vs. Lewis, 69 Mo., 92; People vs. Pearsoll, 50 Mich., 233; Houston vs. State, 24 Fla., 356; 5 South. Rep., 48; Kerr on Law of Homicide, secs. 512, 522.

In addition to the portions of the charge above referred to, the judge further instructed the jury on the subject of an *alibi*, that "when proof of an *alibi* is attempted and proven to the satisfaction of the jury, it is conclusive of the case. When it is attempted, and the proof to sustain it is not satisfactory, the failure to prove it satisfactorily is a circumstance unfavor-

able to the defendant, but it is no more so than an attempt to clear himself by any other false or fabricated testimony." In Turner vs. Commonwealth, 86 Penn. St., 54, the trial judge instructed the jury on the subject of an *alibi*: "If proved, it constitutes a complete defense ; if not proved, and you think it has not been proved, the attempt to manufacture evidence is a circumstance which always bears against the person. No innocent person is driven to manufacture evidence." Of this instruction it is said that it was clearly wrong, in this, that the jury are told that the defendant, having undertaken to defend himself on the ground of *alibi*, must produce evidence sufficient to work his acquittal, or if not, his failure is in itself evidence of guilt. This is adding a penalty to what may be not the defendant's crime, but his misfortune —a result that we cannot sanction. Were the defendant detected in an attempt to corrupt witnesses, or to manufacture evidence, it would certainly weigh heavily against him, but his failure to prove a given point in his defense is no evidence of such attempt, and it ought not to have been submitted as having any bearing on the case." Here the jury are told that a failure to prove the defense of *alibi* satisfactorily is a circumstance unfavorable to the defendant, but no more so than an attempt to clear himself by any other false or fabricated testimony. The failure to prove satisfactorily the *alibi* is placed upon the same basis as an attempt to fabricate testimony. We cannot accept this as correct. The defense of an *alibi* may be true, and

the evidence fail to establish it, or the defendant may put in all the evidence which he has to prove his *alibi* and it may not be satisfactory to the jury, yet the unsuccessful attempt does not prove that the evidence introduced by him was false or fabricated. If the attempt to prove the *alibi* is by means of fabricated evidence, and this fact should be disclosed it would be unfavorable to the accused. Its unfavorableness would consist in the fact that the accused was attempting to shield himself by corrupting the administration of law, and by relying upon what he knew to be without foundation. Toler vs. State, 16 Ohio St., 583.

The judge further says in this portion of his charge that if the accused fails to prove satisfactorily to the jury his defense of *alibi*, it is a circumstance unfavorable to him. The jury should consider all the evidence, and they have a right to draw therefrom conclusions favorable or unfavorable to the accused, but it is not within the province of the court to do this for the jury. A further discussion of this phase of the charge will be found under the next assignment of error.

Again the court instructs the jury that " if there has been circumstances proven tending to show that the defendant was connected with the homicide, and the knowledge to explain such circumstances is plainly shown to have been in the possession of the defendant, and if you are satisfied from all the evidence that he has wilfully declined or intentionally omitted to explain such circumstances, then such omission is a fur-

ther circumstance unfavorable to the innocence of the defendant." This portion of the charge was excepted to by the defendant.

It will be noted that while the judge informs the jury that they are the sole judges of all the evidence, he proceeds to tell them that if there has been proven circumstances tending to show that the accused was connected with the homicide, and the knowledge to explain such cirsumstances is in his possession, and that he has wilfully declined or intentionally omitted to do so, such omission is a further circumstance unfavorable to the accused. If the circumstances tend to show that the accused was connected with the homicide, he is required, under this instruction, to explain, or in default it is counted against him. It is also said that if he have the knowledge to explain under the circumstances, and fail to do so, it is unfavorable to him. The word "knowledge," in the connection in which it is found, would seem to be used as synonymous with "ability." A knowledge to explain would not be of much value to the accused, unless he was possessed of the ability to explain the circumstances. The objection, however, to this portion of the charge is, that the judge is not charging upon the law of the case, but is within the province of the jury. In Newberry vs. State, 26 Fla., 334, 8 South. Rep., 445, it was held that an instruction of the court to the jury in this language, "always remembering that evry evariance or contradiction is not of itself an indication of any design to evade the truth on the part of those tes-

tifying," was improper, as being a charge on the facts of the case. In Gibson vs. State, 26 Fla., 109, 7 South. Rep., 337, it was said that a charge of the court to the jury that "it is the privilege, as well as the duty of counsel, to argue to the best advantage in behalf of their clients. It is the study of a lifetime that they learn how to distort, change, color and discolor facts, in order that they may use them to the best advantage of their clients," was in violation of the statute which forbids a judge to charge on the facts. In Garner vs. State, 28 Fla., 113, 9 South Rep., 843, it is said by the court, "it is the province of the court to pass upon the admissibility of evidence, but when it is in, its credibility and weight are questions for the jury. The guaranty which our statute gives against the court throwing the weight of its opinion as to any question of fact when charging a jury would be of little or no benefit to litigants if judges were at liberty to intimate the same opinions making rulings, or otherwise, in the progress of a cause. The policy of our jurisprudence is that a jury shall decide all such questions of themselves, and entirely liberated from the influence of an intimation of the judge's impressions." In Pinson vs. State, 28 Fla., ——, 9 South. Rep., 706, it is said that "not only is the trial judge prohibited from charging the jury directly as to the sufficiency or weight of the evidence, or from assuming in his charge that certain facts in issue are proven, but he cannot draw an inference or presumption of fact from the evidence. He may charge as to the presumptions which the law, by

settled rule, draws from given facts, but an inference of fact, or the conclusion of the existence of a fact from some other fact, or facts, is always drawn by the jury, who are triers of questions of fact." Tested by these decisions, the instruction under consideration was wrong.

In his motion for a new trial the accused excepted to the following portion of the charge to the jury, to wit: "As to whether the case at bar and the Coffee case, he himself being on trial, are parallel cases, and as to what extent the witness, Ike Spanish, may have been influenced to tell a lie on the defendant, Adams, and himself by reason of fear, or by hopes held out to him, you alone are the judges from all the evidence." This is not all that the court charged in reference to the Coffee case. The other portion of the charge on this subject, and which immediately preceded the portion excepted to, is as follows: "The opinion of our Supreme Court, read and commented on to the court by the counsel in the case of Coffee vs. The State, 26 Fla., was delivered upon an appeal taken by Coffee himself, after he had been convicted of murder in the first degree on his own confession of guilt, extorted from him through fear of his life, with a rope around his neck, placed there by an excited crowd, and who made him promise to tell the same things the next day, and to stick to it in court, and which confessions were afterwards used against him on his trial, and which were admitted as evidence over the objection of his counsel, because his said confessions had been obtained by

threats, violence and fear, and because his said confessions were not his free and voluntary act. The law as laid down by our Supreme Court in that case has been the law for ages in all civilized countries. Judge Mitchell speaking for the court, and showing that such confessions could not be used against Coffee on his trial, used the following language, and asked, does the evidence clearly show that the confessions made at Martel was freely and voluntarily made? and then goes on to say as follows: 'But the day before the prisoner, who was accused of a most atrocious crime, was taken by the guard. under whose protection he should have been, from the very presence of the officers of the law, including the Justice of the Peace, carried to the woods near by with a rope around his neck, and there swung up to a limb, and before the muzzles of shot-guns and Winchester rifles, and being told it was his last hour, was forced to confess that he was guilty of the crime with which he was charged, forced to promise that he would stick to the confession he had made, and forced to promise that he would stick to what he then confessed in court." The portion of the charge excepted to contains two propositions, viz: to what extent the case at bar and the Coffee case are parallel, and to what extent the witness, Spanish, was influenced in his testimony by reason of hope or fear. One of these propositions, viz: as to what extent Spanish was influenced by hope or fear, is unquestionably correct, and under the rule in reference to exceptions, we might decline to consider this assignment of error,

but as this case must go back for another trial, it is not improper for us to express our opinion in reference to the portion of the charge on the Coffee case. Under our judicial system the trial judge instructs the jury only on the law of the case. In doing this he informs them what is the law applicable to the case under consideration. To state to the jury the facts of a case already adjudicated by our Supreme Court, and then submit to them the question whether or not that case and the one under consideration are parallel, would be improper and would not be giving them the law of the case, but would be leaving the jury to form notions of the law by a comparison of the two cases. The principle of the law in reference to the admission of voluntary confessions was applied in the Coffee case, and the same principle must be applied in every case coming up for adjudication where the facts make it applicable. The question discussed in that portion of the Coffee case submitted by the judge to the jury has reference to the admissibility of the confessions in evidence, a question exclusively within the province of the court. In the Coffee case the trial court erred in permitting to go before the jury the confessions of the accused, but in the case before us no objection was made to the evidence of Ike Spanish on the ground that it was not voluntary. It is true that some testimony was introduced tending to show that before Spanish made a former statement implicating the accused, threats were made against him and inducements were held out to him to make the statement, but these

were matters properly laid before the jury in order
that they might arrive at a correct verdict as to whether
or not his testimony on the trial was false.    The jury
have nothing to do with the questions as to the admis-
sibility of evidence, and we think the court erred in
instructing them as it did in reference to the Coffee
case.

A further exception to the charge of the court is
based upon the following portion, viz : "Malice is im-
plied from any deliberate, cool, injurious and unlawful
act against another, which shows an abandoned and
malignant heart, and if one person, without apparent
provocation, wilfully and intentionally and unlawfully
shoots another with a deadly weapon, although he
had no previous malice or ill-will against the party
slain, yet he is presumed to have had such malice at
the moment of the shooting, and unless the evidence
shows that he was acting from some innocent or proper
motive, or that he was justified or excusable, such kill-
ing would be murder ; (it is a presumption of law that
every sane man intends the natural and reasonable
consequence of his own free and voluntary acts, and if
a sane person wilfully and intentionally fires a load of
buck-shot into the body of another person in close
proximity to him, it is an inference of the law that he
intends thereby to cause great bodily harm or death,
and unless such shot was fired under circumstances
showing justification or excuse, then it is an inference
of law, and the law presumes that it was maliciously
done), and if the evidence shows that such shot was

fired in pursuance of a well-formed purpose to kill such person unlawfully, or to kill a human being unlawfully, and the person shot dies from the effect of the wounds then and there given, then the person firing such shot is guilty of murder in the first degree, even though prior to such killing the relations of the slayer and the slain might have been friendly, or apparently friendly, and even though the motive for such unlawful act be not fully proven, or if proven, that it appears totally inadequate to you."

Prior to the enactment of the statute on the subject of homicide in 1868, the common law rule in reference to presumptions of malice from the act of killing a human being, obtained in this State. By this rule the offense of murder was established by proving the fact of killing, and then it devolved upon the accused to show the facts and circumstances reducing the crime to a lower degree, or showing that the killing was justifiable or excusable, unless such facts and circumstances appeared from the proofs on the part of the State. Holland vs. State, 12 Fla., 117 ; Gladden vs. State, 15 Fla., 623 ; Dixon vs. State, *Ibid*, 637. It was held in Dukes vs. State, 14 Fla., 499, that this common law rule was essentially changed by the statute, and that this legal presumption of malice arising from the fact of killing no longer existed. The interpretation placed upon the statute by the previous decisions of this court has wrought a decided change in the law of felonious homicide, and one necessary to be observed in laying down the law on this subject. Dukes vs. State, *supra*,

Ernest vs. State, 20 Fla., 383.    This change is so radi-
cal as to require a departure from the common law in-
dictment in alleging the offense of murder.    Denham
vs. State, 22 Fla., 664; Wiggins vs. State, 25 Fla.,
180. ˙ In fact, the common law offense of murder no
longer exists in this State, and in lieu thereof we have
the statutory crime of premeditated killing.    Under
our adjudications the law does not presume malice or
a premeditated design from the mere fact of killing.
The statute declares murder in the first degree to be a
killing with a premeditated design to effect the death
of the person killed, or a human being.    The act of
killing is only part of the offense, and in order to be
complete it must be done with a premeditated design
to effect death.    The animus with which the killing
was done must be ascertained from the facts and cir-
cumstances of the case.    In every case the question of
a premeditated design is one of fact, like every other
fact in the case, to be ascertained by the jury from the
testimony.    Savage and James vs. State, 18 Fla., 909.
In charging the jury on the subject of premeditation
the court cannot draw conclusions from the facts any
more than it can· upon any other branch of the case.
The portion of the charge now under consideration
contains some correct statements of the law on this
subject, but mixed along with these statements are
come propositions that are not correct as to the pre-
sumptions of the law on the subject of premeditation,
or malice.    In this charge it is asserted that it " is a
presumption of law that every sane man intends ˙ the

natural and reasonable consequence of his own free voluntary acts, and if a sane person wilfully and intentionally fires a load of buck-shot into the body of another person in close proximity to him, it is an inference of the law that he intends thereby to cause great bodily harm or death." So far there is no objection, but immediately following it is said, "and unless such shot was fired under circumstances showing justification or excuse, then it is an inference of law and the law presumes that it was maliciously done." This clause asserts that the law presumes malice from the mere fact of killing, in the absence of any other showing, and in this respect it is wrong. The law does not apply or presume malice or premeditation from the fact of killing. This must be shown by the fact and circumstances of the case, and the jury, and not the court, can infer malice, or premeditated design, from the facts. To state the matter briefly, under our adjudications the court must submit the question of premeditation just as it would any other question of fact arising in the case. On the facts of the case before us, we do not commit ourselves to the proposition that the accused would be entitled for the error mentioned, to a reversal of the judgment, in the absence of other errors. However erroneous the judge was in charing the jury that malice or premeditation was a presumtion of law, yet if they believed that the accused shot the deceased under the circumstances of this case; the fact that it was done with premeditation was irresistable.

The accused assigns as error the following other portion of the charge of the court to the jury, viz: "It is natural and human for you to sorrow when you contemplate the fact that young Moore was suddenly struck down in the morning of life, and sent into the presence of the eternal Judge, with no time for preparation, nor can humanity refuse to show its tears with, and to sympathize with his young wife and her little babes; and it is equally natural, and our humanity cannot help sympathizing with a fellow-being on trial for his life, and for his faithful wife and her innocent children; for his weeping mother and devoted brother; but you were not sworn to try the case by your sympaties, but by the evidence as delivered to you by the witnesses on the witness stand under their oaths." Immediately preceding this portion of the charge the judge had stated to the jury that much had been said about the consequences to society and the accused growing out of their verdict. It is not objectionable for the court, to call the attention of the jury to the fact that they are to try the case by the evidence given to them, and not by their sympathies. · No doubt the able judge who sat at the trial of this case thought it proper to caution the jury against being led astray by their sympathies. The language of the charge employed to accomplish this object, however, is calculated to impress the mind with the idea that the very condition against which the judge was seeking to guard, was likely thereby to be produced, to-wit: An undue excitement of the sympathies of the jury.

Another assignment of error is, "that the defendant, during the progress of the trial, was carried from the court room against his consent and locked up in jail."

The bill of exceptions shows that an objection was made by the counsel for the accused to the competency of Ike Spanish as a witness for the State, and pending the discussion of this question before the court, the jury was sent from the court room. The officers who had the custody of the defendant, Adams, through mistake took him also from the court room and carried him to jail. Counsel for the defendant then proceeded to discuss before the court the competency of Ike Spanish as a witness, and had proceeded about ten minutes with the discussion in the absence of the prisoner, when his presence was missed. The State Attorney called the attention of the court to the absence of the prisoner, and thereupon the court requested the counsel for defendant to suspend his argument, which he did, at the same time excepting to the removal of the prisoner from the court room without his consent, and his being deprived of a right guaranteed by the Constitution. On the return of the prisoner to to the court room the judge requested his attorney, in order to save any difficulty that may arise by reason of the inadvertance, to commence anew his argument, and that the court would hear his views and authorities anew. Defendant by his counsel declined to say anything further, but insisted that his objection to taking the accused from the court room be noted. Without any

argument further, either from defendant or the State, the court decided that the witness was competent to testify against the accused. It was early decided in this State, and has been rigidly adhered to in later decisions, that the prisoner has the right, and in fact must be present during the trial of a capital case, and no steps can be taken by the court in his absence. Holton vs. State, 2 Fla., 476, 500; Gladden vs. State, 12 Fla., 562; Irvin vs. State, 19 Fla., 872. There is no doubt about the fact that the accused here was taken from the court room and remained out for at least ten minutes during the discussion of the competency of a witness against him. He has the right to be present and to hear questions of law as well as questions of fact discussed, and in fact no steps can be taken in the case in his absence. The court must see in capital cases that the accused is present before any proceedings are taken in the case. The fact that the court directed the argument to be gone over again could not possibly restore the accused to the position of hearing what had already been said in his absence.

The last ground of the motion for a new trial is, "that the jury received whiskey during the progress of the trial."

The brother of the accused made an affidavit stating that he learned from the baliff. that he had taken jugs of whiskey from the express office for several members of the jury, and that whiskey was conveyed to them from time to time during the progress of the trial. The

bailiff, J. C. Marcum filed an affidavit, in which he states that he took from the express office for the jury a half gallon jug of whiskey, and that during the trial four of the jurors were sick, and under instructions from the court, he gave the jury small portions of said whiskey at a time, as medicine, and that at no time was any one of the jury under the influence of said liquor, but they were sober, thoughtful and very discreet, both in and out of the court. The other bailiff makes an affidavit corroborating Marcum's statement. There is nothing to show that the jury received any whiskey except what the court permitted to be given to them as medicine, and it is made affirmatively to appear, and there is nothing to the contrary, that there was no misbehavior on the part of the jury in consequence of the whiskey. The court did not err in refusing to set aside the verdict on the ground that whiskey was given to the jury. Bird vs. State, 18 Fla., 593.

There are some other assignments of error in the record, and one involving a grave question of misconduct on the part of the bailiff in charge of the jury, and one of the jurors. As the case has to go back on other grounds for a new trial, and these assignments of error present questions that are not likely to arise again, we will not prolong this opinion by discussing them. In a case like this where human life is involved, the jury should not be influenced by any improper considerations, and no avenue of improper approach should be left open. We feel that we can rely upon

the Circuit Judge to guard against an opportunity to improperly influence the verdict of the jury.

For the errors herein pointed out, the judgment in this case must be reversed and a new trial awarded.